**Dr. Charles E. KEENAN, Plaintiff,**

v.

**BOARD OF EDUCATION OF the CITY OF CHICAGO, et al., Defendants.**

**No. 92 C 0177.**

United States District Court,
N.D. Illinois, E.D.

May 18, 1992.

Robert Orman, Law Office of Robert Orman, Jeffrey Wayne Finke, Hartman & Finke, Chicago, IL, for plaintiff Dr. Charles E. Keenan.

Iris E. Sholder, Michael J. Hernandez, Asst. Attys. Gen., for defendant Bd. of Educ.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This reverse-discrimination action arises out of plaintiff Dr. Charles E. Keenan's termination from employment as principal of Jane A. Neil School ("Neil School"). Keenan brings this multi-count action against nine members of the Neil Local School Council in both their individual and official capacities,[1] the Neil Local School Council,[2] the current principal of Neil

---

1. On March 13, 1992, this court dismissed without prejudice and with leave to reinstate defendant Clarence Jones.

2. Effective May 1, 1989, the Chicago School Reform Act, Ill.Rev.Stat. ch. 122, ¶ 34–2.1, established a "local school council" for each grammar school and high school in the Chicago public school system in order to shift the authority for individual school decisions from a central-

ized Board of Education to the individual school level. The local school council is comprised of the school principal and 10 elected members (2 teachers employed at the school, 6 parents of students currently enrolled at the school, and 2 community residents). The Illinois Supreme Court in *Fumarolo v. Chicago Bd. of Educ.,* 142 Ill.2d 54, 153 Ill.Dec. 177, 566 N.E.2d 1283 (1990), held that the Chicago School Reform Act's voting scheme for electing local school

School, and the Board of Education of the City of Chicago (the "Board"). Currently before the court are the parties' cross-motions for summary judgment on Counts V and VI of Keenan's amended complaint. For the reasons set forth below, we grant defendants', and deny Keenan's, motion for summary judgment.

## I. Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment is appropriate if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). This standard places the initial burden on the moving party to identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Rule 56(c)). Once the moving party has done this, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(c). In deciding a motion for summary judgment, the court must read all facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); *Griffin v. Thomas*, 929 F.2d 1210, 1212 (7th Cir.1991).

## II. Undisputed Facts

Keenan, a white male born on July 20, 1934, had been in the employ of the Board since January 1958. He served as a teacher until 1967, at which time he became a principal. On June 18, 1979, Keenan became the principal of Neil School, where he served in such capacity until June 30, 1991.

In January of 1991, the Neil Local School Council notified Keenan that it would not renew his contract. This action transpired despite the fact that Keenan's immediate

supervisor, Richard E. Stephenson, District Superintendent of the Chicago Board of Education, evaluated Keenan favorably during the 1990–91 school year. In April 1991, the Local School Council hired Peter Smith, a black man approximately eleven years younger than Keenan, as the new principal of Neil School. Unlike Keenan, Smith, at the time he was hired, did not have a doctoral degree. As such, Keenan asserts that he was more qualified than Smith to be principal of Neil School, and that the Local School Council's choice of Smith was based on Keenan's race and age.

Keenan filed this action on January 9, 1992. In his amended complaint, Keenan claims that defendants' intentional and discriminatory refusal to renew his contract was in violation of 42 U.S.C. § 1981 (Count I), the equal protection clauses of the United States Constitution and the Illinois Constitution (Count II),[3] Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (Count III), and the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (Count IV). Counts V and VI, the subject of the instant cross-motions for summary judgment, assert that Keenan was denied the rights guaranteed to him under a "Plan for the Implementation of the Provisions of Title VI of the Civil Rights Act of 1964 Related To: Integration of Faculties, Assignment Patterns of Principals, and Bilingual Education Programs" (the "Implementation Plan"), adopted by the Board on October 12, 1977. Finally, in Counts VII and VIII of his amended complaint, Keenan pleads violations of the Chicago School Reform Act, Ill.Rev.Stat. ch. 122, ¶ 34–1 *et seq.*

## III. Discussion

■ In Counts V and VI, Keenan asserts that the decision to not renew his contract without affording him the rights provided in the "Protective Principles" section of the Implementation Plan violates: (1) the Implementation Plan itself and Keenan's

---

councils violated the equal protection guarantees of the United States Constitution and the Illinois Constitution. However, effective January 11, 1991, the Illinois legislature reenacted the Act consistent with the dictates of *Fumarolo*.

**3.** Pursuant to motion by the plaintiff, on March 13, 1992, this court dismissed Count II of the amended complaint as to defendant Board of Education of the City of Chicago.

third-party beneficiary rights to the protective provisions set forth in the Implementation Plan; (2) Title VI of the Civil Rights Act, as amended, 42 U.S.C. § 2000d *et seq.;* and (3) the due process clauses of the United States Constitution and the Illinois Constitution. As framed by Keenan, each of his claims hinges on the viability of the Implementation Plan.[4]

Following exhaustive negotiations with the United States Department of Justice and the Offices of Equal Educational Opportunity and Civil Rights of the Department of Health, Education and Welfare, the Board adopted the Implementation Plan on October 12, 1977. This Implementation Plan constituted an agreement between the Board and the Department of Health, Education and Welfare ("HEW"), and outlined the obligations of the Board pursuant to Title VI of the Civil Rights Act of 1964. Specifically, under the Implementation Plan principals would be assigned or reassigned so as to eliminate any identifiable pattern of assignment based on race so that the percentage of non-minority principals assigned to minority schools shall be the same as the percentage of non-minority principals assigned in the system as a whole. In effectuating the program of reassignment, reassigned employees, including principals, were afforded a number of rights, detailed in a section of the Implementation Plan entitled "Protective Principles." The protective principles apply to adverse personnel actions (including but not limited to dismissal, demotion or unsatisfactory evaluations) affecting all persons transferred or otherwise assigned for purposes of desegregation, and include the following:

(1) The right not to be demoted, dismissed or adversely affected in job position or compensation on the basis of race or color.

(2) The right not to be subject to dismissal, demotion, adverse compensation or other adverse personnel action in the absence of just cause which is defined as a violation of conduct based on "written, objective, and nondiscriminatory criteria."

(3) In the event of adverse personnel action, the right to the following:

(i) A detailed bill of particulars setting forth the allegedly unsatisfactory performance or conduct;

(ii) A hearing including appellate review; and

(iii) Payment by the Board of "any and all necessary expenses and reasonable fees of counsel, selected by the [principal], incurred in any and all proceedings with respect to such adverse action, including all Appellate review of such action."

The Implementation Plan provides for modification only in the event that the Board and HEW enter into a written mutual modification agreement.

It is undisputed that Keenan never received any statement alleging he had violated any standard of conduct. Nor did he receive any written statement of objective and nondiscriminatory criteria which would constitute grounds for termination. Furthermore, Keenan was not provided with a bill of particulars, and was not afforded a hearing to determine just cause in connection with the decision not to renew his contract. Moreover, defendants concede that at the time Keenan voluntarily transferred to Neil School in 1979, he was entitled to the protections of the Implementation Plan. Nonetheless, defendants argue that they are entitled to judgment as a matter of law on Counts V and VI of the amended complaint because the Implementation Plan has been superseded and, as such, cannot form the basis of Keenan's claims. We agree.

---

**4.** With respect to his Title VI claim, Keenan states that "[i]nasmuch as the Protective Principles are incorporated in an agreement denoted 'Plan for the Implementation of the Provisions of *Title VI* of the Civil Rights Act of 1964 Related to: Integration of Faculties, Assignment Patterns of Principals, and Bilingual Education Programs,' the rights being sued upon here necessarily are secured by Title VI." Keenan Reply at 9–10 (emphasis in original). Likewise, in support of his due process claims, Keenan "relies on the Protective Principles set forth in the 1977 Implementation Plan." *Id.* at 10.

Despite the Board's good faith effort to comply with Title VI via the Implementation Plan, the United States filed a complaint on September 24, 1980, charging the Board with discrimination in the "assignment of students and otherwise." Additionally, HEW in 1979 and 1980 found the Board ineligible for funding under the Emergency School Aid Act on the basis that the Chicago public school system was characterized by segregated and overcrowded schools. This finding by HEW was reaffirmed by the Department of Education on June 12, 1980. After protracted and complex negotiations, the United States and the Board entered into a Consent Decree resolving both of the matters discussed above. That Consent Decree was approved by United States District Court Judge Milton I. Shadur, and subsequently withstood constitutional challenge. *United States v. Board of Educ. of the City of Chicago*, 554 F.Supp. 912, 928 (N.D.Ill.1983). Rather than seeking to negotiate the specific parameters of each desegregation effort, the parties agreed to general principles that would guide the subsequent development of a comprehensive Desegregation Plan. The Desegregation Plan would encompass not only student desegregation, but also bilingual education and faculty assignment—areas previously addressed in the 1977 Implementation Plan.

To develop the educational components of the Desegregation Plan, the Board retained a team of independent, nationally recognized consultants. The lead consultant, with principal overall responsibility for this process, was Dr. Robert L. Green, then Dean of the College of Urban Development, Michigan State University. Dr. Green submitted his Recommendations on Educational Components to the Board of Education on April 3, 1981. Two weeks later, the Recommendations were adopted by the Board as Part I of the Desegregation Plan: Educational Components. After careful review, the Plan was approved by the Justice Department and this court. *Id.* at 915. The content of Part I of the Plan is summarized by its Table of Contents:

A. Introduction
B. Educational Components
    1. Curriculum and Instruction—Elementary Schools
    2. Curriculum and Instruction—High Schools
    3. Magnet Schools
    4. Vocational and Technical High Schools
    5. Special Education and Testing
    6. Bilingual Education
    7. Within–School Segregation
    8. Student Discipline
C. Staff Development
D. Other Components
    1. Public Participation
    2. Metropolitan Initiatives
    3. Faculty Desegregation and Affirmative Action
    4. Evaluation
    5. Monitoring
E. Appendix

Subsection D(2) specifically addresses faculty desegregation and affirmative action. In discussing the need for an affirmative action program, the Plan states: "The need for a comprehensive program is evidenced by the under-representation of Hispanics in administrative positions." Desegregation Plan at 97. Contrary to Keenan's assertion, this subsection is comprehensive and advocates the establishment of an affirmative action program for identification, training, and placement of minority candidates for administrative positions, including that of principal. Desegregation Plan at 100. Indeed, the Consent Decree requires the Board to

make every good faith effort to follow professional staff assignment and transfer practices which, when taken together as a whole on a frequently reviewed periodic basis, will assure that the racial composition, the experience and the educational background of individual school faculties and *administrative staff* more nearly approach [plus or minus ten percentage points of city-wide averages for race, experience and training for each type of school facility] the city-wide proportions of minority, experienced, and more extensively trained professional

staff.... The Board will not adopt or follow assignment and transfer practices which will foreseeably result in the racial identifiability of schools based on faculty or *administrative staff* composition.

Consent Decree ¶ 3.2, at 18–19 (emphases added). Neither the Consent decree nor the Desegregation Plan contains a "Protective Principles" provision.

Significantly, both parties to the 1977 Implementation Plan (*i.e.*, the Board and HEW) agree that the 1980 Consent Decree and its related documents supersede the Implementation Plan. On May 16, 1991, the Office for Civil Rights of HEW ("OCR") received a complaint alleging that nine principals who originally had been transferred or assigned pursuant to the 1977 Implementation Plan were, or would be, terminated in violation of the Implementation Plan and the Consent Decree. OCR is the agency responsible for the enforcement of Title VI of the Civil Rights Act of 1964. Under Title VI and 34 C.F.R. § 100.3(c), OCR may exercise its authority over complaints alleging race discrimination in employment under only two circumstances: (1) if a primary objective of the federal financial assistance rendered is to provide employment; or (2) if the alleged conduct results in discrimination against program beneficiaries on the basis of race, color or national origin. OCR determined that the first criterion did not apply because providing employment is not a primary objective of the financial assistance provided to the Chicago Public School District. Regarding whether the alleged discrimination results in discrimination against program beneficiaries on the basis of race, color or national origin, the petitioners contended that the governing standards were embodied, at least in part, in the 1977 Implementation Plan. OCR has determined, however, that "the 1977 Plan was superseded for Title VI purposes by the Consent Decree and the Desegregation Plan and that, for school segregation issues, the Consent Decree essentially prescribes the [Board's] current Title VI obligations with respect to the assignment of principals." Defendants' Brief in Support, Exhibit E, at 2. Finding that the assign-

ments by the Local School Councils were not conclusively in violation of the Consent Decree, OCR concluded that "the alleged discrimination did not result in discrimination against program beneficiaries on the basis of race, color or national origin." *Id.* As such, OCR transferred the complaint to the Equal Employment Opportunity Commission for inquiry into whether the alleged conduct may violate Title VII of the Civil Rights Act of 1964. As did OCR, this court finds that, after a careful review of all relevant documents as well as the circumstances surrounding the two agreements, the Consent Decree and Desegregation Plan in fact supplants the 1977 Implementation Plan as the Board's obligations under Title VI and, as such, Counts V and VI of Keenan's amended complaint cannot stand.

■ Keenan, however, argues that, despite the superseding Consent Decree and Desegregation Plan, the "Protective Principles" of the 1977 Implementation Plan nevertheless apply in this particular case because his right as a third-party beneficiary to those "promises" vested prior to the modification. Although not a party to the agreement, Keenan contends that he is a third-party creditor beneficiary as he was transferred pursuant to the Plan, evidenced by statements of the General Superintendent of Schools for the Board. We disagree. Under Illinois law, for a person to claim as a third-party beneficiary, the agreement must clearly show that it was entered into for the direct benefit of the third party. *155 Harbor Drive Condominium Assoc. v. Harbor Point Inc.*, 209 Ill. App.3d 631, 646, 154 Ill.Dec. 365, 374, 568 N.E.2d 365, 374 (1st Dist.1991). Incidental benefits flowing to third-parties do not create contractual rights. *Id.* Intention of the parties, as evidenced by the contract and the surrounding circumstances, controls this inquiry. *Id.; Ball Corp. v. Bohlin Building Corp.*, 187 Ill.App.3d 175, 177, 134 Ill.Dec. 823, 824, 543 N.E.2d 106, 107 (1st Dist.1989). Clearly, the protections of the 1977 Plan, previously applicable to transfers such as Keenan's to Neil School, benefited Keenan. Nonetheless,

the Board and HEW did not enter into that agreement so that Keenan, or any other principal, would be afforded those specific protections. The Implementation Plan came about after the threat of litigation, and was agreed upon by the Board in an effort to comply with the dictates of Title VI. In essence, the Plan is a promise to the government by the Board that it will abide by the dictates of Title VI. Keenan is nothing more than an incidental beneficiary of that promise. To hold otherwise would significantly frustrate the government's ability to enforce the mandates of Title VI. There is no single formulation that will satisfy the demands of Title VI and the United States Constitution. The Implementation Plan clearly recognized this reality, providing for modification if necessary. Indeed, the 1980 Consent Decree represents the failure of the Implementation Plan and the shifting of the Board's obligations under Title VI. Were this court to conclude that Keenan possessed third-party contractual rights to enforce the Plan, despite the ineffectiveness of the attempt to comply with Title VI, subsequent efforts to remedy the inadequacy would be impeded. This eventuality certainly was not the parties' intention. The Board must be free to develop programs effecting desegregation without concern that each attempt may create third-party contractual rights in its employees.

## IV. Conclusion

For the reasons stated above, we grant defendants' motion for summary judgment on Counts V and VI of Keenan's amended complaint. Keenan's motion for summary judgment is denied. It is so ordered.