Gwendolyn **WOODS**, Adrienne **Greene,** and Lavonne **Harmon, Plaintiffs,**

v.

Calvin C. **FOSTER, Robert L. House, The New Life Outreach Ministries of Chicago, and The New Life Baptist Church of Chicago, Defendants.**

No. 94 C 4187.

United States District Court,
N.D. Illinois,
Eastern Division.

Jan. 4, 1995.

Andrew J. Cohen, Laurene Marie Heybach, Walter David Koeninger, Patricia Nix-Hodes, Legal Assistance Foundation of Chicago, Julie Lynn Biehl, D'Ancona & Pflaum, Chicago, IL, for plaintiffs Gwendolyn Woods, Adrienne Greene.

Philip C. Parenti, Law Office of Philip C. Parenti, Jeffrey Jay LeVine, Law Office of Jeffrey J. LeVine, Chicago, IL, for defendants Calvin C. Foster, Robert L. House.

Dennis Minichello, Janet M. Kyte, Keck, Mahin & Cate, Chicago, IL, for defendants New Life Outreach Ministries of Chicago, New Life Baptist Church of Chicago.

### MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Gwendolyn Woods, Adrienne Greene and Lavonne Harmon (collectively "Plaintiffs") allege that Calvin Foster, Robert House, the New Life Outreach Ministries of Chicago ("the Ministries") and the New Life Baptist Church of Chicago ("the Church") (collectively "Defendants") violated the Fair Housing Act ("FHA"), breached a contract with the City of Chicago to the detriment of the Plaintiffs, and negligently caused the Plaintiffs to suffer emotional distress. Plaintiffs seek a declaration that Defendants violated several provisions of the FHA, compensatory and punitive damages, and attorneys' fees.

The case is now before the Court on the motion to dismiss the First Amended Complaint filed by the Ministries and the Church. The Court allowed Defendants Foster and

House to adopt the motion to dismiss of the corporate defendants.[1]

## I. BACKGROUND ALLEGATIONS

The facts, as alleged by Plaintiffs in their First Amended Complaint,[2] are as follows.

The Ministries is a not-for-profit Illinois corporation that operates a residential facility for otherwise homeless families in Chicago ("the Shelter"). The Church is also a not-for-profit Illinois corporation. Plaintiffs allege that the Ministries functions at the direction of the Church. Calvin Foster is the executive director of the Ministries. Robert House is the Chairman of the Board of Directors of the Ministries and the pastor of the Church. In July, 1992, the Ministries entered into a contract with the City of Chicago Department of Human Services (the "DHS Contract"). The DHS Contract provided that the Ministries would house otherwise homeless families and assist such families in obtaining other services, including permanent housing. Plaintiffs allege that the Church was also a party to the DHS Contract, although it is not clear whether the Church was a signatory. The DHS Contract was signed on behalf of the Ministries by Foster and House. The Ministries received $125,000 pursuant to the DHS Contract, which was funded by the United States Department of Housing and Urban Development ("HUD").

Plaintiffs are women who resided at the Shelter during 1993. The Plaintiffs range in age from 23 to 34 years. Plaintiffs Woods, Greene, and Harmon have three, four, and five children, respectively. All three Plaintiffs allege that they were subjected to sexual advances, lewd touching of their bodies, sexually suggestive remarks and requests for sexual favors by Defendant House. One Plaintiff alleges similar mistreatment by Defendant Foster. All three Plaintiffs allege that House and Foster made it known to them that their ability to stay at the Shelter and receive the other assistance that the Shelter provided was dependent upon their willingness to provide sexual favors to House, Foster, or both. Plaintiffs further allege that the activities of House and Foster were known amongst other residents of the Shelter.

One Plaintiff alleges that, shortly after her arrival at the Shelter, Defendant Foster told her she "look[ed] nice" and stated, "we have to get together." A few days later, Plaintiff went to Foster's office to request a withdrawal of funds from the savings account she had been required to open. Rather than immediately grant her request, Defendant Foster allegedly locked the door, kissed and fondled Plaintiff. Defendant Foster allegedly told Plaintiff to "keep your business to yourself." A few days later, Foster gave Plaintiff a ride from a court appointment to a motel where he pressured her to engage in sex. Plaintiff alleges that she submitted because she was fearful that she would be forced to leave the Shelter if she did not. Plaintiff further claims that, on a different occasion, Defendant House called her to his office, locked the door, and kissed and fondled Plaintiff. Plaintiff claims that House told her that he and Foster would help her obtain permanent housing. On another occasion, House took Plaintiff to a motel and promised to get her housing if she engaged in sex with him. Plaintiff claims she submitted under pressure of a feared loss of housing if she refused. Plaintiff refused a further advance by House, inquiring about the promised assistance in obtaining permanent housing. Plaintiff alleges that both House and Foster subsequently "became cool towards her." Plaintiff alleges that shortly thereafter, she was falsely accused of stealing and was forced to leave the Shelter with her children by Defendant Foster.

---

**1.** In addition, the corporate defendants "adopt the Reply" memorandum of the individual defendants. Because the individual and corporate defendants each adopt the arguments of the other, the Court will not distinguish between them, except to the extent that the corporate defendants argue that they are not liable for the acts of the individual defendants.

**2.** In their First Amended Complaint, filed after Defendants' motion to dismiss, Plaintiffs added allegations claiming that Lavonne Harmon was subjected to the same type of treatment as Gwendolyn Woods and Adrienne Greene. The Court has agreed to consider the motion to dismiss as though it was filed in response to the First Amended Complaint.

Another Plaintiff alleges that Defendant House grabbed her and attempted to remove her clothing, stopping only after repeated protest by Plaintiff. Plaintiff further alleges that House told her that he would help her obtain permanent housing for herself and her children if she would have sex with him, but, if she refused, he would force her to leave the Shelter, and prevent her admission at any other shelter. Plaintiff submitted to House once, but refused thereafter. Plaintiff alleges that after refusing, she and her children were forced to leave the Shelter by Defendant Foster.

A third Plaintiff alleges that, shortly after coming to the Shelter, Defendant House asked her to come to his office and there asked her if she could get a babysitter for her children so that he could take her out. After the Plaintiff informed a staff member of this conversation, House allegedly called her into his office and told her she should not tell the staff about him. Plaintiff further alleges that House told her that he would help her find housing if she cooperated with him and told her to come to his office after her children had gone to sleep. Plaintiff did not do so, but was in House's office several days later to deposit part of a check in her Shelter savings account, as required by Shelter policy. House allegedly locked the door, kissed Plaintiff, grabbed Plaintiff, and pressed himself against her. Plaintiff ran from the office and left the Shelter that day. Plaintiff alleges that she believed she could not stay at the Shelter unless she complied with House's demands. Plaintiff experienced a period of homelessness after leaving the Shelter and did not receive any assistance from the Shelter in obtaining permanent housing.

All three Plaintiffs claim that the advances of Foster and House were unwelcome. Furthermore, all three claim that the alleged acts of Foster and House created a pervasively offensive and hostile atmosphere at the Shelter.

## II. ANALYSIS

Defendants move to dismiss Plaintiffs' five count First Amended Complaint. Defendants argue that the first three counts, based on the FHA, should be dismissed because the Shelter does not qualify as a "dwelling" as the term is used in the FHA. Defendants also rely on the language of the FHA to argue for the dismissal of counts I and II, insisting that the Defendants' alleged actions are beyond the scope of the FHA as Defendants did not engage in the "sale or rental" of any property. Defendants also argue that, if the FHA claims are dismissed, the state law claims should be dismissed for lack of subject matter jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). Defendants argue, in the alternative, that Plaintiffs cannot sustain a third party action for breach of contract and that Plaintiffs' negligence claim fails because Plaintiffs have not alleged that Defendants owed Plaintiffs a duty that was breached. Lastly, the corporate defendants argue that they are not liable for the acts of the individual defendants.

### A. The Standard on a Motion to Dismiss

The purpose of a Rule 12(b)(6) motion is to test the legal sufficiency of a complaint. See Adams v. Cavanagh Communities Corp., 847 F.Supp. 1390, 1396 (N.D.Ill.1994). In order to survive a motion to dismiss, a complaint must allege sufficient facts to outline a cause of action. Davis v. Frapolly, 747 F.Supp. 451 (N.D.Ill.1989). The complaint "must state either direct or inferential allegations concerning all of the material elements necessary for recovery under the relevant legal theory." Carl Sandburg Village Condominium Ass'n No. 1 v. First Condominium Dev. Co., 758 F.2d 203, 207 (7th Cir.1985).

The Court must accept as true all well pleaded factual allegations in the complaint and view them, along with the reasonable inferences to be drawn from them, in the light most favorable to the plaintiff. Cornfield v. Consolidated High School District No. 230, 991 F.2d 1316, 1324 (7th Cir.1993). However, the Court need not accept as true conclusory legal allegations. Vaden v. Village of Maywood, Illinois, 809 F.2d 361, 363 (7th Cir.), cert. denied, 482 U.S. 908, 107 S.Ct. 2489, 96 L.Ed.2d 381 (1987). Furthermore, the Court need not strain to find inferences from the complaint's allegations. P & P Mktg., Inc. v. Ditton, 746 F.Supp. 1354,

1357 (N.D.Ill.1990). When evaluating the legal sufficiency of a plaintiff's factual allegations, courts are held to a strict standard. A motion to dismiss may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Cushing v. City of Chicago,* 3 F.3d 1156, 1159 (7th Cir.1993).

### B. "Dwelling" for the Purposes of the FHA

■ Defendants argue that Plaintiffs cannot state a claim against them under the FHA because the sections of the FHA under which Plaintiffs seek to recover apply only to "dwellings" and the Shelter does not fall within the FHA's definition of "dwelling." The FHA provides:

> "Dwelling" means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction of location thereon of any such building, structure, or portion thereof.

42 U.S.C. § 3602(b). Plaintiffs argue that the Shelter should be considered a "dwelling" as defined by the FHA.

A structure, or a portion thereof, is a "dwelling" if it is designed or intended for occupancy as a residence by one or more families. The FHA does not define "residence." The issue before the Court is whether a shelter for homeless people is a residence, particularly in light of its goal of locating permanent housing for its tenants. The Seventh Circuit has not addressed this question. Most courts that have considered the scope of the term "dwelling" in the FHA have cited the analysis of *United States v. Hughes Memorial Home,* 396 F.Supp. 544, 548–49 (W.D.Va.1975) with approval. *See United States v. Columbus Country Club,* 915 F.2d 877 (3d Cir.1990), *cert. denied,* 501 U.S. 1205, 111 S.Ct. 2797, 115 L.Ed.2d 971 (1991); *Baxter v. City of Belleville,* 720 F.Supp. 720 (S.D.Ill.1989); *Patel v. Holley House Motels,* 483 F.Supp. 374 (S.D.Ala.

1979). The *Hughes* court resorted to the "ordinary meaning" of a residence as:

> a temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from the place of temporary sojourn or transient visit.

*Hughes,* 396 F.Supp. at 549. The *Hughes* court determined that a home for children in need was a "dwelling" under the FHA even though the home was not intended as the permanent home of the children, who lived there an average of four years.

Additionally, the FHA should be given a "generous construction" to effectuate its "broad and inclusive" language. *Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 616 F.2d 1006, 1011 (7th Cir.1980) (citing *Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 209, 93 S.Ct. 364, 366–67, 34 L.Ed.2d 415 (1972)). To date, the following structures have been held to be "dwellings" under the FHA: summer homes, *Columbus Country Club,* 915 F.2d at 881; a cooperative apartment building, *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032, 1036 (2d Cir.1979); and a converted office building to be used as a hospice for those suffering from Acquired Immune Deficiency Syndrome, *Baxter,* 720 F.Supp. at 731. Among the structures that have been held not to be "dwellings" within the scope of the FHA are a motel, *Patel,* 483 F.Supp. at 381; vacant land held for commercial use, *United States v. Mintzes,* 304 F.Supp. 1305 (D.Md.1969); and a grocery store, *Matsunaga v. Century 21,* slip op., No. 84 C 11018, 1985 WL 1113 (N.D.Ill.1985).

The Court concludes that the building, or portion thereof, in question here is a dwelling for the purposes of the FHA. The Shelter is provided for those in need of shelter; the homeless are not visitors or those on a temporary sojourn in the sense of motel guests. Although the Shelter is not designed to be a place of permanent residence, it cannot be said that the people who live there do not intend to return—they have nowhere else to go. As recognized by the *Hughes* and *Baxter* courts, the length of time one expects to live in a particular place does is not the exclusive factor in determining whether the place is a residence or a "dwelling." Because

the people who live in the Shelter have nowhere else to "return to," the Shelter is their residence in the sense that they live there and not in any other place.

Defendants argue that the Shelter·is merely a form of public accommodation, like the motel in *Patel.* Furthermore, Defendants argue that the Shelter is designed merely to "give a homeless woman a place to sleep and to keep her family safe while the woman looks for employment and permanent housing." The Court finds the reasoning of the *Baxter* court persuasive in this regard. In *Baxter*, the court realized that some of the AIDS victims that would be staying in the facility would be there because they would be "in need of a place to live." *Baxter*, 720 F.Supp. at 731. The court distinguished between transients, those who would certainly be moving on to some other residence, such as the hotel guests in ·*Patel*, and inhabitants, those who reside in a particular place, although the length of the residence may vary. The same distinction is applicable here. The women in the Shelter inhabit the Shelter, although the length of time they live there depends on their success in finding more permanent housing. Their residence is not so short-lived or transient that the Shelter can be considered a mere public accommodation.

Defendants also argue, without citation, that persons living in the Shelter may not stay more than 120 days and may not return to the Shelter after leaving, but acknowledge that these rules are subject to exceptions in "extraordinary circumstances." As noted by the *Hughes* court, a dwelling may be a "temporary" residence, but may not be merely transient. The Court is not persuaded that a 120 day stay, if in fact that is the limit, is a transient visit, as the term is used in the *Hughes* opinion.

The fact that the Plaintiffs have no other place to "return to"·or reside leads the Court to conclude that they reside at the Shelter while participating in the Shelter's program. This fact, in combination with a generous construction of the FHA, persuades the Court to hold that the Shelter is a dwelling for the purposes of the FHA.

### C. "Sale or Rental" for the Purposes of the FHA

Defendants argue that Plaintiffs' claims under 42 U.S.C. § 3604 are deficient because the Defendants did not engage in the sale or rental of housing. The relevant sections of the FHA provide:

It shall be unlawful—

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

42 U.S.C. § 3604. Defendants argue that they do not sell or rent the available space at the Shelter and that they are therefore outside the scope of the FHA. Plaintiffs argue that subsection 3604(a), in addition to prohibiting discrimination in the sale or rental of property, makes it unlawful to "otherwise make unavailable or deny a dwelling to any person because of race, color, religion, sex, familial status, or national origin." Plaintiffs further argue that subsections 3604(b) and (c) apply to this case because the Ministries "rents" the Shelter, in so far as it receives money under the DHS Contract as consideration for providing the homeless a place to live.

### 1. To Otherwise Make Unavailable or Deny

Plaintiffs argue that the reach of section 3604(a) goes beyond sales and rentals because of the inclusion of the prohibition of

"to otherwise make unavailable or deny a dwelling" for improper reasons. Plaintiffs' argument is supported by the analysis of many courts, including this one, that have interpreted the phrase to be "as broad as Congress could have made it." *See, e.g., Steptoe v. Beverly Area Planning Association,* 674 F.Supp. 1313, 1319 (N.D.Ill.1987) (quoting *Zuch v. Hussey,* 366 F.Supp. 553, 557 (E.D.Mich.1973)). Furthermore, the Seventh Circuit has interpreted the prohibition against otherwise making unavailable or denying dwellings to reach conduct outside the sale or rental of housing. *See N.A.A.C.P. v. American Family Mutual Insurance Co.,* 978 F.2d 287, 297–301 (7th Cir.1992) (insurance redlining), *cert. denied,* —— U.S. ——, 113 S.Ct. 2335, 124 L.Ed.2d 247 (1993).

Defendants argue that "otherwise make unavailable or deny" in section 3604(a) should be read in the context of "sale or rental, especially when subsections (b) and (c) of the Act are clearly limited to 'sale or rental.'" Defendants further argue that, if this approach is followed, Plaintiffs cannot recover against the Defendants because the Shelter is free to the homeless. This argument, however, is precluded by the plain language of the FHA, which prohibits acts which "otherwise make unavailable or deny" dwellings for impermissible reasons.

Defendants also argue that even if the FHA has been correctly interpreted to reach conduct such as insurance redlining, it does not reach the conduct alleged in this case because the Shelter is free to the people who live there. Defendants misunderstand the language and purpose of the FHA. The FHA was passed in order to "provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601. The FHA was, in part, a response to widespread racial segregation. *Huntington Branch, N.A.A.C.P. v. Town of Huntington,* 844 F.2d 926, 934–37 (2d Cir.), *aff'd per curiam,* 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988). As such, there is no reason to conclude that the scope of the FHA should be limited to those who pay for their own housing, rather than extended to all victims of the types of discrimination prohibited by the Act.

Because subsection 3604(a) makes it unlawful to otherwise make unavailable or deny a dwelling because of sex, the Court rejects Defendants argument that the FHA is limited to acts related to the sale or rental of a dwelling. Additionally, the Court notes that Plaintiffs also allege a violation of 42 U.S.C. § 3617, which is not limited to acts of "sale" or "rental."

### 2. To "Rent"

■ Plaintiffs argue that their claims under subsections 3604(b) and 3604(c) should not be dismissed because the Defendants "rent" the Shelter for the purposes of the FHA. The FHA defines "to rent" as follows:

"To rent" includes to lease, to sublease, to let and otherwise to grant for a consideration the right to occupy premises not owned by the occupant.

42 U.S.C. § 3602(e). This definition does not require that the consideration be paid by the occupant. Plaintiffs allege that the Ministries received $125,000 from HUD pursuant to the DHS Contract in return for providing a shelter for the homeless. The money received is undoubtedly "consideration" granted for the right to occupy the premises of the Shelter.

Defendants argue that because the Plaintiffs provide no consideration to the Ministries in return for residing at the Shelter, they do not "rent." The statute, however, does not require that the consideration be provided by the occupant. Furthermore, "to rent" as defined in the FHA, is an act performed by the owner of the property, not the occupant. The acts of the Ministries in this case satisfy the requirements and establish that the Ministries "rented" the Shelter. Therefore, Plaintiffs claims under subsections 3604(b) and 3604(c) should not be dismissed.

Having held that Plaintiffs' claims under section 3604 survive Defendants' motion to dismiss, the Court need not consider Defendants' arguments for the dismissal of the state law claims for lack of pendent jurisdiction. The Court will therefore proceed to discuss Defendants' substantive arguments for the dismissal of Plaintiffs' state law claims of breach of contract and negligence.

## D. The Breach of Contract Claim

■ Plaintiffs claim that they may recover for the Defendants alleged breach of the DHS Contract with the City of Chicago as third party beneficiaries. In order for a third party to recover for breach of contract, the contract must show that it was entered into for the direct benefit of the third party. *Keenan v. Board of Education of the City of Chicago,* 812 F.Supp. 780, 784 (N.D.Ill.1992) (citing *155 Harbor Drive Condominium Assoc. v. Harbor Point, Inc.,* 209 Ill.App.3d 631, 154 Ill.Dec. 365, 374, 568 N.E.2d 365, 374 (1991). Incidental benefits flowing to third parties do not create contractual rights. *Id.* Plaintiffs claim that the DHS Contract was executed with the intention of providing a benefit directly to the homeless persons who would reside at the Shelter.

■ Defendants argue that Plaintiffs are merely incidental beneficiaries of the DHS Contract. Defendants rely on *Smith v. Washington Heights Apartments, Ltd.,* 794 F.Supp. 1141 (S.D.Fla.1992), in which the court held that residents of a privately owned, federally subsidized housing complex could not recover under a breach of contract theory for breaches of the agreement between the owners of the complex and the federal government. *Id.* at 1143–44. The *Smith* opinion does not discuss the language of the contract upon which it relies, providing only, "[t]he Court simply does not believe that the parties to the HAP contracts intended for the tenants to have an enforceable right to bring suit under a third party beneficiary theory." *Id.* at 1144.

Plaintiffs argue that *Smith* is inapposite because the law of the Seventh Circuit is stated in *Holbrook v. Pitt,* 643 F.2d 1261 (7th Cir.1981). In *Holbrook,* the court held that needy families who were to receive housing assistance payments under federal law were the primary beneficiaries of contracts between the landlords and HUD. The Court rejected HUD's argument that the tenants were only incidental beneficiaries while the direct beneficiary was the HUD program that was being funded. The court wrote:

> HUD's position displays an astonishing lack of perspective about government social welfare programs. If the tenants are not the primary beneficiaries of a program designed to provide housing assistance to low income families, the legitimacy of the multi-billion dollar Section 8 program is placed in grave doubt.

*Id.* at 1271. Defendants argue that *Holbrook* may be distinguished from the instant case on the ground that the government largess in that case was available only for those tenants who qualified, rather than all residents, as is the case at the Shelter. Defendants argue that because individual tenants were not subsidized by the DHS Contract, as in *Holbrook,* the cases are distinguishable. From the language quoted above, it is apparent to the Court that the Seventh Circuit, in *Holbrook,* was not relying on the method of payment under the HUD contract to determine that the tenants were the intended beneficiaries.

The Court notes, however, that the Seventh Circuit, in *Holbrook,* did rely, in part, on the language of the contract alleged to be breached. This is consistent with the analysis of *Keenan,* in which the court stated that a third party could bring suit only if the contract and the surrounding circumstances established that the parties intended to directly benefit the third party. Here, the DHS Contract is not properly before the Court. In the First Amended Complaint, Plaintiffs claim to be the direct beneficiaries of the DHS Contract because the DHS Contract directs the Ministries to provide various benefits to otherwise homeless persons. The Court is not obligated to accept this legal conclusion as true. However, Plaintiffs are not required to plead evidence. As Defendants have not established that Plaintiffs cannot recover on the facts alleged in the First Amended Complaint, the motion to dismiss must be denied. Defendants may, of course, submit the text of the DHS contract with a motion for summary judgment, if appropriate.

## E. The Negligence Count

Defendants argue that count V of the First Amended Complaint must be dismissed because Plaintiffs fail to allege that the Defendants owed any duty to the Plaintiffs. Count V provides, in part:

By accepting plaintiffs Woods, Greene and Harmon as residents of New Life Outreach Ministries, defendants assumed a duty to treat plaintiffs in a reasonable manner and a duty to exercise the skill, knowledge and expertise that reasonably qualified professionals possess and a duty to comply with statutes designed to protect plaintiffs. By sexually harassing plaintiffs, defendants breached the duties owed to plaintiffs and proximately caused plaintiffs to suffer emotional distress.

First Amended Complaint, ¶ 47. Paragraph 47 also alleges that the defendants breached their duty of care to the plaintiffs by retaining Foster and House in positions in which the defendants knew or should have known that Foster, House, or both would cause harm to the residents. Plaintiffs argue that the First Amended Complaint sufficiently alleges a duty in three instances. First, Plaintiffs argue that the Defendants voluntarily assumed various duties under the DHS contract. Second, Plaintiffs claim that the First Amended Complaint alleges a duty owed by virtue of the special relationship between the Defendants and Plaintiffs. Third, Plaintiffs argue that employers clearly have a duty to exercise reasonable care in the retention and supervision of their employees.

The Court finds it unnecessary to consider Plaintiff's arguments for the imposition of a special duty on Defendants because the Court considers the duty to refrain from participating in the sexual abuse of the Plaintiffs to be included in the general duty of care owed by the Defendants to all persons. Defendants owe Plaintiffs a duty to refrain from harming them. *Waynick v. Chicago's Last Department Store,* 269 F.2d 322, 325 (7th Cir.1959) ("Every person has a general duty to use due care ... not to injure others."), *cert. denied, Saxner v. Waynick,* 362 U.S. 903, 80 S.Ct. 611, 4 L.Ed.2d 554 (1960). The allegations of sexual abuse in the First Amended Complaint are undoubtedly harmful.

■ Whether a duty exists is a question of law to be determined by the Court. *Gouge v. Central Illinois Public Service,* 144 Ill.2d 535, 163 Ill.Dec. 842, 846, 582 N.E.2d 108, 112 (1991). The imposition of a duty is an act of judicial policymaking. *Homer v. Pabst Brewing Co.,* 806 F.2d 119, 121 (7th Cir. 1986). The imposition of a duty depends on whether the parties stood in such a relationship to one another that the law imposes an obligation on the defendant to act reasonably for the protection of the plaintiff. *Gouge,* 163 Ill.Dec. at 846, 582 N.E.2d at 112. Factors to be considered include the foreseeability of injury, the likelihood of injury, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the defendants. *Id.*

■ The Court finds that each of these factors militates towards imposing a duty upon Defendants to refrain from sexually abusing, or participating in or enabling the sexual abuse of those persons put in their care. The relationship between the Defendants and the Plaintiffs is of sufficient closeness and obligation to impose some duty on Defendants to treat Plaintiff reasonably. Defendants are care providers, hired to provide shelter and services to Plaintiffs. This relationship is accompanied by a duty to provide those services without active harm. The foreseeability and likelihood of injury from the alleged coercive sexual activities are both high. The burden of refraining from and guarding against such activity is virtually nil. Furthermore, the Court can discern no adverse consequences from the imposition of such a duty. Therefore, the Court holds that Defendants owed Plaintiffs a duty to refrain from conditioning the benefits of the Shelter upon the performance of sexual acts. The Court also holds that paragraph 47 of the First Amended Complaint sufficiently states both the existence and the violation of this duty within the requirements of notice pleading.

■ The Court also notes that an employer owes a duty to third parties to exercise reasonable care in the retention and supervision of its employees. *United States Fidelity and Guaranty Co. v. Open Sesame Child Care Center,* 819 F.Supp. 756, 760 (N.D.Ill.1993). A duty exists to refrain from employing individuals that the employer knows, or should know, are a danger to others. *See Hunter v. Allis–Chalmers Corp., Engine Division,* 797 F.2d 1417, 1422 (7th

Cir.1986); *Huber v. Seaton*, 186 Ill.App.3d 503, 134 Ill.Dec. 285, 288, 542 N.E.2d 464, 467 (Ill.App.), *appeal denied*, 128 Ill.2d 663, 139 Ill.Dec. 513, 548 N.E.2d 1069 (1989). Plaintiffs allege that House told Foster and others of his sexual activities and that other residents of the Shelter were aware of the activities of both House and Foster. Plaintiffs also allege that House and Foster were aware that other residents discussed the alleged exploits of the individual defendants. These allegations are sufficient to claim that the corporate defendants, as employers, knew or should have known that House and Foster were potentially dangerous to the residents. Therefore, Plaintiffs allege a breach of the duty to use due care in the selection and retention of employees.

Furthermore, although Plaintiffs have labeled Count V of the First Amended Complaint "Negligence," the Court finds that Plaintiffs have pled sufficient facts to state a claim for the intentional torts of assault and battery as well. The existence of these additional causes of action, as well as the confusion surrounding the divergent duties owed to Plaintiffs by the corporate and individual Defendants persuades the Court to encourage Plaintiffs to file a Second Amended Complaint. In their Second Amended Complaint, Plaintiffs should allege each tort against each defendant in separate count in order to make clear what the specific allegations are.

Because Plaintiffs have adequately stated at least one ground in negligence upon which relief can be granted, count V should not be dismissed.[3]

### F. Liability Under a Theory of Respondeat Superior

■ The corporate defendants, the Church and the Ministries, argue that they cannot be held liable for the intentional acts of House and Foster, because the alleged acts of sexual harassment are beyond the scope of the employment of either. Plaintiffs argue that the Church and the Ministries are not protected by their status as employers

because both House and Foster, as officers of the Church and the Ministries, act on behalf of those entities. Plaintiffs cite *Hunter*, 797 F.2d 1417, where the court stated:

> Since the acts of a corporation are acts of human beings, to say that the "corporation" has committed some wrong (rather than just that it is liable under the doctrine of respondeat superior for an employee's wrong) simply means that someone at the decision-making level in the corporate hierarchy has committed the wrong; the deliberate act of such a person is the corporation's deliberate act.... Whether his supervisors know or should have known what he did is irrelevant; it becomes relevant only where the wrong is committed by someone below the managerial level.

*Id.* at 1422. This principle was recently affirmed in *Saxton v. American Telephone and Telegraph Co.*, 10 F.3d 526, 536 n. 19 (7th Cir.1993). Plaintiffs have adequately alleged that both Foster and House are decision makers for the Ministries. First Amended Complaint, ¶¶ 8, 9. Plaintiffs have also alleged that House is a decision maker for the Church. First Amended Complaint, ¶ 9. Therefore, the acts of House and Foster are the acts of the corporate defendants. *Saxton*, 10 F.3d at 536 n. 19. Furthermore, given the allegation that the Ministries functions at the direction of the Church, Plaintiffs allegations that Foster and House are decision makers for the Ministries is sufficient to state a claim against the Church as a result of the intentional acts of House and Foster.

### III. CONCLUSION

For the reasons given in this opinion, Defendants' motion to dismiss is DENIED. Plaintiffs are granted leave to file a final amendment to their complaint in order to clarify their tort allegations with respect to the various defendants.

---

**3.** The Court notes that the Church has objected to its inclusion in this lawsuit, arguing that it is a separate entity from the Ministries. Plaintiffs, however, have alleged that the Church directs the activities of the Ministries and that the Ministries functions under the control of the Church.

First Amended Complaint, ¶ 19. As the Court must accept as true all the well pled factual allegations in the complaint, it must assume, for the purposes of this motion, that the Church employed Foster and House.