**LAUER FARMS, INC., Patrick Lauer and Michael Lauer, Plaintiffs,**

v.

**WAUSHARA COUNTY BOARD OF ADJUSTMENT, Defendant.**

No. 95–C–402.

United States District Court, E.D. Wisconsin.

Nov. 25, 1997.

---

## DECISION AND ORDER

CALLAHAN, United States Magistrate Judge.

### Background

This action was commenced with the filing of the plaintiffs' complaint, which was shortly thereafter followed by an amended complaint. In their amended complaint the plaintiffs (Lauer Farms, Inc., Patrick Lauer and Michael Lauer, the "Lauers") allege several causes of action arising out of a decision by defendant Waushara County Board of Adjustments (the "Board of Adjustments") to deny to the plaintiffs a conditional use permit so that they might build housing for migrant workers on 17.57 acres of land that the plaintiffs were seeking to purchase. According to the plaintiffs' amended complaint, the land that the plaintiffs had proposed purchasing and placing migrant worker housing on is located in the Town of Oasis. The plaintiffs had appeared at an Oasis town board meeting where they presented their plans to build the proposed migrant housing. At that first meeting the town board expressed no objections so long as the plaintiffs complied with zoning ordinances. Thereafter, again according to the plaintiffs' complaint, at a regularly scheduled town board meeting, a number of local citizens appeared and made their opposition known to the town board regarding the proposed building of migrant housing. At subsequent meetings of the town board and at a meeting of the Waushara Planning and Zoning Committee, townspeople opposing the plaintiffs' plan for migrant housing made discriminatory remarks and "inappropriate references to the ethnicity, race, socioeconomic and family status, and the income sources of the expected tenants." (Amended Complaint, ¶ 15). According to the plaintiffs, the Board of Adjustment ultimately voted to deny the plaintiffs' conditional use application, basing its decision on "discriminatory reasons." (Amended Complaint, ¶ 16). With the denial of their application, the plaintiffs' efforts to purchase the parcel of property came to an end. Indeed, according to paragraph 18 of the amended complaint, "the cited land was sold to a different buyer and is no longer available to the plaintiffs." On February 11, 1994, the plaintiffs filed a complaint with the Wisconsin Department of Industry, Labor and Human Relations alleging a violation of the Wisconsin Open Housing Law. On April 14, 1995, this action was filed.

The plaintiffs' amended complaint asserts multiple claims. The first and second claims assert violations of 42 U.S.C. § 3604 and 42 U.S.C. § 3617, respectively, i.e., violations of the Fair Housing Act. The plaintiffs' third, fourth and fifth claims assert violations of

various federal civil rights laws. Specifically, the third claim asserts a violation of 42 U.S.C. § 1981; the fourth claim asserts a violation of 42 U.S.C. § 1982; and, the fifth claim asserts a violation of 42 U.S.C. § 1983. The plaintiffs' final claim asserts a state law violation of the Wisconsin Open Housing Act, § 101.22, Wis. Stats. [now renumbered § 106.04, Wis. Stats.].

After being properly served, the defendant filed its answer. Discovery was thereafter undertaken. In accordance with this court's various scheduling orders, the defendant has now filed a motion for summary judgment supported by a memorandum, affidavits and proposed findings of fact, in accordance with Local Rule 6.05 (E.D.Wis.). The plaintiffs have filed their own brief, together with affidavits, and responses to the defendant's proposed findings of fact, along with the plaintiffs' own proposed additional findings of fact. The defendant has filed submissions in reply. Therefore, the defendant's motion for summary judgment is fully briefed and ready for resolution.

The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(b) and Rule 73, Fed.R.Civ.P. Venue is proper in this district. For the reasons which follow, the defendant's motion for summary judgment is **GRANTED** in part and **DENIED** in part.

As stated, each of the parties has filed proposed findings of fact, in accordance with Local Rule 6.05, and responses to their adversary's proposed findings of fact.[1] Distilling the various proposed findings of fact to their underdisputed essence, the following facts are established for purposes of the defendant's motion.

### Facts

Plaintiff, Lauer Farms, Inc., is a Wisconsin corporation with its primary place of business located at Route 1, Box 354, Almond, Wisconsin, 54909. (Defendant's Findings of Fact ("FF"), No. 1). Plaintiffs, Patrick and Michael Lauer, are the sole owners of Lauer Farms, Inc. (Defendants' FF, No. 2). Mi-

chael Lauer resides at Route 3, Box 101, Wautoma, Wisconsin, 54982. (Defendant's FF, No. 3). Patrick Lauer resides at Route 2, Box 182, Plainfield, Wisconsin, 54966. (Defendant's FF, No. 4). The defendant, Waushara County Board of Adjustment, is a duly instituted board of Waushara County, with post office address of P.O. Box 149, Wautoma, Wisconsin, 54982. (Defendant's FF, No. 5).

On or about April 13, 1993, plaintiffs presented to the town board of the Town of Oasis a proposal for the establishment of a migrant camp. The town board considered and tentatively approved plaintiffs' proposal as long as it was approved by Waushara County. (Plaintiffs' FF, No. 2).

On May 20, 1993, plaintiffs set forth a proposal before the Waushara County Planning and Zoning Committee in which plaintiffs requested a conditional use permit to establish a migrant worker camp on approximately 17 acres of vacant land within Waushara County which plaintiffs planned to purchase. (Defendant's FF, No. 9). On the conditional use permit application, plaintiff Michael Lauer identified the land which is the subject of this case as vacant land used as a gravel pit. (Defendant's FF, No. 21). The parcel of land at issue was in 1993, and remains today, zoned for agricultural use under a zoning classification of General Agriculture ("GA"). (Defendant's FF, No. 10).

At the May 20, 1993, Planning and Zoning Committee hearing, Leonard Zywicki, the chairman of the town board of the Town of Oasis, expressed his opposition to plaintiffs' conditional use permit. Mr. Zywicki made discriminatory and racist statements against migrant workers to the effect that migrant workers were trouble makers and would create problems. (Plaintiffs' FF, No. 29).

The Waushara County Planning and Zoning Committee initially approved the plaintiffs' request for a conditional use permit, and that decision was appealed to the Waushara County Board of Adjustment.

---

1. To many of the plaintiffs' proposed additional undisputed findings of fact the defendant has responded that they are not material to the defendant's motion. However, the defendant has not asserted that they are disputed. Therefore, for purposes of this motion such particular proposed findings of fact will be construed as undisputed.

(Defendant's FF, No. 11) (Plaintiffs' FF, No. 4). Specifically, on or about May 27, 1993, Bill Clendenning and Lee Keenlancy filed an appeal with the Waushara County Board of Adjustment of the approval of the conditional use permit granted by the Waushara County Planning and Zoning Committee. (Plaintiffs' FF, No. 7) (Defendant's FF, No. 11).

On or about July 6, 1993, the town board of the Town of Oasis heard objections from local residences concerning approval of plaintiffs' conditional use permit by the Waushara County Planning and Zoning Committee. The town board voted against approval of the conditional use permit. (Plaintiffs' FF, No. 9).

One factor in the town board's disapproval of plaintiffs' conditional use permit was the vocal and expressed opposition of local residents to the establishment of a migrant camp. (Plaintiffs' FF, No. 10). Many of the comments presented by the local citizens at the town board meeting on or about July 6, 1993, were of a discriminatory and racist nature against migrant workers and their families. (Plaintiffs' FF, No. 11).

On or about July 8, 1993, a motion was presented to the Waushara County Board of Adjustment stating that the town board of the Town of Oasis objected to the approval of plaintiffs' conditional use permit. (Plaintiffs' FF, No. 12).

On July 14, 1993, members of the Board of Adjustment made an on-site inspection of the property which was the subject of plaintiffs' conditional use permit application. (Defendant's FF, No. 12).

On or about July 15, 1993, the appeal of plaintiffs' conditional use permit was considered at a Waushara County Board of Adjustment meeting. (Plaintiffs' FF, No. 13). At that meeting, the Board of Adjustment met to review the subject appeal in open session and heard testimony in connection therewith. (Defendant's FF, No. 13).

Following the open session of the Board of Adjustment, the Board of Adjustment met in closed session for deliberations and then reconvened in open session to vote on the appeal. (Defendant's FF, No. 14). The Board of Adjustment voted to deny the plaintiffs' application for a conditional use permit on July 15, 1993. (Defendant's FF, No. 15).

Many comments and letters by local residents presented at the July 15, 1993, Board of Adjustment meeting were of a discriminatory and racist nature against "Mexicans", migrant workers and their families. (Plaintiffs' FF, No. 14). One reason stated by local residents in opposition to plaintiffs' conditional use permit was that migrant workers would overburden the county welfare system. (Plaintiffs' FF, No. 15). Migrant workers receive funding and assistance from community-based organizations and federal and state monies. (Plaintiffs' FF, No. 16).

One reason stated by local residents in opposition to plaintiffs' conditional use permit was that a migrant camp could overburden the county school system. (Plaintiffs' FF, No. 17). The school system located in Waushara County is supported by state monies and programs. Additionally, the operation of plaintiffs' proposed migrant camp would not extend into the school year. (Plaintiffs' FF, No. 18).

One reason stated by local residents in opposition to plaintiffs' conditional use permit was that a migrant camp would adversely affect and/or harm police and fire protection in Waushara County. (Plaintiffs' FF, No. 19). Another reason stated by local residents in opposition to plaintiffs' conditional use permit was that migrant workers and/or their families would engage in criminal behavior. (Plaintiffs' FF, No. 20). Another reason stated by local residents in opposition of plaintiffs' conditional use permit was that the children of migrant workers would engage in conduct that would create problems for local school children and residents. (Plaintiffs' FF, No. 22).

The opposition and remarks of the local residents were motivating factors in the Board of Adjustment's ultimate denial of plaintiffs' conditional use permit. (Plaintiffs' FF, No. 23). Moreover, the Board of Adjustment reviewed the transcript from the May 20, 1993, Planning and Zoning Committee hearing prior to the July 15, 1993, public hearing and before issuing its decision. (Plaintiffs' FF, No. 30).

Membership of the Board of Adjustment has changed since 1993. (Plaintiffs' FF, No. 24).

Neither the Board of Adjustment nor the Waushara County Planning and Zoning Committee granted a conditional use permit between January 1, 1990, and May 9, 1997, to any party wishing to utilize agricultural land for a similar purpose as that proposed by plaintiffs in 1993, except in circumstances which involved migrant worker camps. (Defendant's FF, No. 19).

Since the time of the Board of Adjustment's action on plaintiffs' application for a conditional use permit, the Board of Adjustment or the Waushara County Planning and Zoning Committee has approved two applications for conditional use permits in connection with the establishment or expansion of migrant housing. (Defendant's FF, No. 17). Since the time of the Board of Adjustment's action on the plaintiffs' application for a conditional use permit, neither the Board of Adjustment nor the Waushara County Planning and Zoning Committee has denied any application for a conditional use permit in connection with the establishment or expansion of migrant housing. (Defendant's FF, No. 18).

Eight conditional use applications for migrant worker camps within Waushara County were granted from 1979 to 1993. (Defendant's FF, No. 7). There were no instances between 1979 and 1993 in which applications for conditional use permits for migrant worker camps were denied. (Defendant's FF, No. 8).

Approximately 27 migrant worker camps are located within Waushara County. (Defendant's FF, No. 6). However, no conditional use permits for the establishment or expansion of migrant camps granted since 1979 have been located in the Town of Oasis. (Plaintiffs' FF, No. 25).

The majority of migrant workers who come to Wisconsin are hired directly by an employer or are hired through a migrant labor contractor. (Plaintiffs' FF, No. 6).

Plaintiffs would not typically plant a pickle crop until sometime in late May through mid June. (Defendant's FF, No. 22). In 1993, plaintiffs began planting their pickle crop on May 21. (Defendant's FF, No. 23). Migrant workers which plaintiffs anticipated employing were not expected to remain at the proposed migrant camp beyond the 1st of September. (Defendant's FF, No. 24). Use of the proposed migrant camp would have been limited to a period beginning May 1 and ending October 31. (Defendant's FF, No. 25).

Plaintiffs filed a discrimination complaint with the State of Wisconsin Department of Industry, Labor and Human Relations, Equal Rights Division, on or about February 11, 1994. This complaint alleged that defendant discriminated against plaintiffs by denying the conditional use permit due to the race of the "probable employees and tenants." (Plaintiffs' FF, No. 26). An amended complaint was filed with the Equal Rights Division on or about September 21, 1994, to include family status as a basis for discrimination. (Plaintiffs' FF, No. 27).

### Standard for Summary Judgment

Recently, in *Bridgman v. New Trier High School, District No. 203*, 128 F.3d 1146 (7th Cir.1997)), the Seventh Circuit Court of Appeals reiterated the standards for summary judgment. In *Bridgman* the court stated:

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c); *see, Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265. The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in favor of that party. *See, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202. Once the moving party has produced evidence to show that it is entitled to summary judgment, the nonmoving party must affirmatively demonstrate that a genuine issue of material fact remains for trial. *Johnson v. City of Ft. Wayne*, 91 F.3d 922, 931 (7th Cir.1996).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings. "The object of [Rule 56(e)] is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation,* 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695. Moreover, a genuine issue of material fact is not shown by the mere existence of "*some* alleged factual dispute between the parties," *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509, or by "some metaphysical doubt as to the material facts," *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538. Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512.

*Bridgman,* 128 F.3d at 1147–48.

### The Defendant's Arguments

The grounds upon which the defendant bases its motion for summary judgment vary depending upon the claim being attacked. Specifically, the defendant argues that the plaintiffs lack standing to pursue their asserted claims under 42 U.S.C. §§ 1981, 1982 and 1983. With respect to the plaintiffs' claims under the Fair Housing Act, 42 U.S.C. §§ 3604(a), 3604(b) and 3617, the defendant argues that the plaintiffs have failed to satisfy their burden of presenting a prima facie case of discrimination. The defendant also argues that the plaintiffs' claims under the Fair Housing Act should be dismissed because the vacant land for which the plaintiffs sought a conditional use permit does not constitute a "dwelling" subject to the Act. Finally, as to the plaintiffs' state law claim under the Wisconsin Open Housing Act, the defendant argues that such claim should be dismissed because: (1) the plaintiffs failed to comply with the itemized claim requirement of § 893.80(1)(b), Wis. Stats.; (2) § 893.80(4), Wis. Stats., renders the Waushara County Board of Adjustment immune from suit based upon intentional acts; and, (3) § 893.80(4), Wis. Stats., renders the Waushara County Board of Adjustment immune from suit based upon its discretionary acts.

### 1. The Plaintiffs' Standing to Pursue Claims under 42 U.S.C. §§ 1981, 1982 and 1983.

■ The defendant argues that the plaintiffs have no standing to sue under 42 U.S.C. §§ 1981–1983. The heart of their position is found on page 3 of their memorandum: "The issue to be decided in this case is whether potential employers may assert for their own monetary benefit the civil rights of prospective migrant employees with whom they have no existing relationship based upon a municipality's denial of a request for a conditional use permit which would allow land zoned for agricultural use to be used as a site for temporary quarters for migrant employees."

In that connection, a review of the plaintiffs' allegations with respect to such claims is appropriate. In their amended complaint the plaintiffs assert that the conduct of the Waushara County Board of Adjustment violated §§ 1981–1983 of Title 42 in the following respects. First, as to 42 U.S.C. § 1981:

31. Defendant WBA [Waushara County Board of Adjustments] violated the Civil Rights Act of 1870, 42 U.S.C. § 1981, by denying Plaintiffs, who sought to provide housing to Hispanic and Jamaican workers, an equal right to make and enforce contracts, and an equal right to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

32. The Defendant violated Plaintiffs' equal rights by refusing Plaintiffs' request for a conditional use of land in order to build a migrant camp on the basis of the race, color, and national origin of the camp's prospective occupants.

33. As a result of Defendant WBA's unlawful conduct, Plaintiffs have suffered damages in the form of economic loss and deprivation of their civil and constitutional rights.

(Amended Complaint, p. 8).

The plaintiffs' allegations relative to the alleged violation of 42 U.S.C. § 1982 state:

35. Defendant WBA violated the Civil Rights Act of 1866, 42 U.S.C. § 1982, by denying Plaintiffs, who sought to provide housing to Hispanic and Jamaican workers, the right to purchase and/or hold real property as is enjoyed by white citizens, by refusing to allow Plaintiffs' request for a conditional use of land in order to build a migrant camp because of the race, color, and/or national origin of the proposed housing camp's occupants.

36. As a result of defendant WBA's unlawful conduct, Plaintiffs suffered damages in the form of economic loss and the loss of civil rights.

(Amended Complaint, p. 9).

Finally, as to their claim under 42 U.S.C. § 1983, the plaintiffs allege:

38. Defendant violated 42 U.S.C. § 1983 by depriving Plaintiffs, who sought to provide housing to Hispanic and Jamaican workers in the location in questions (sic) of their civil rights by denying them a conditional use permit based on the race, color, and/or national origin of the occupants of the proposed housing camp.

39. Defendants (sic) were acting under the color of state law in denying the conditional use permit, and as such, the Defendants (sic) engaged in policy making.

40. As a result of Defendant WBA's unlawful conduct, Plaintiffs suffered damages in the form of economic loss and the loss of civil rights.

(Amended Complaint, pp. 9–10).

According to the Supreme Court in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975):

In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise ... In both dimensions it is founded in concern about the proper—and properly limited—role of the courts in a democratic society.

*Id.*, at 498, 95 S.Ct. at 2205.

The Supreme Court has emphasized the importance of the minimum constitutional requirements of standing to the exercise of federal jurisdiction.

Those who do not possess Art. III standing may not litigate as suitors in the courts of the United States. Article III, which is every bit as important in its circumscription of the judicial power of the United States as in its granting of that power, is not merely a troublesome hurdle to be overcome if possible so as to reach the "merits" of a lawsuit which a party desires to have adjudicated; it is a part of the basic charter promulgated by the Framers of the Constitution at Philadelphia in 1787, a charter which created a general government, provided for the interaction between that government and the governments of the several States, and was later amended so as to either enhance or limit its authority with respect to both the States and individuals.

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 475–76, 102 S.Ct. 752, 760–61, 70 L.Ed.2d 700 (1982).

As delineated by the court in *Valley Forge*, the minimum constitutional requirements of standing are as follows:

[A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of putatively illegal conduct of the defendant.", *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450] (1976).

454 U.S. at 472, 102 S.Ct. at 758.

If a plaintiff fails to meet the minimum constitutional requirements for standing, the district court must dismiss the action for failure of subject matter jurisdiction. *Hope, Inc. v. County of DuPage, Illinois*, 738 F.2d 797, 804 (7th Cir.1984); *see also, People Organized for Welfare and Employment Rights v. Thompson*, 727 F.2d 167, 169 (7th

Cir.1984). And standing does not necessarily flow from the validity of the plaintiff's contention on the merits, rather the focus is on the plaintiff and whether he or she has alleged and proven facts necessary to meet the minimum constitutional requirements of standing. *Hope,* 738 F.2d at 804. Stated another way, "[t]he first element of the standing inquiry that [a plaintiff] 'must satisfy in this Court is the· "case" or "controversy" requirement of Article III of the United States Constitution.' ... The relevant inquiry for a case or controversy is to determine whether a plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision." *Penny Saver Publications, Inc. v. Village of Hazel Crest,* 905 F.2d 150, 154 (7th Cir.1990).

In the instant case, the plaintiffs have met the Article III standing requirement, i.e., injury in fact. They have demonstrated loss of the opportunity to, presumably, make money, by making migrant housing conditions so attractive to certain migrant workers that those migrant workers would choose to work for the plaintiffs in the operation of their pickle fields.

In some instances, however, it is not enough that a plaintiff have suffered injury in fact in order to have standing. "When a person or entity seeks standing to advance the constitutional rights of others, we ask two questions: first, has the litigant suffered some injury in fact, adequate to satisfy Article III's case-or-controversy requirement; and second, do prudential considerations which we have identified in our prior cases point to permitting the litigant to advance the claim?" *Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 623, n. 3, 109 S.Ct. 2646, 2651, n. 3, 105 L.Ed.2d 528 (1989). In this case the plaintiffs must also satisfy these prudential considerations. This is because the facts demonstrate that it is the constitutional rights of the migrant workers that the plaintiffs in this case are, in reality,

advancing. Indeed, although the plaintiffs claim that they "suffered damages in the form of economic loss and the loss of civil rights", a fair reading of the amended complaint, as fleshed out by the undisputed facts, reveals that it is the alleged discriminatory conduct engaged in by the defendant against the prospective "Hispanic and Jamaican workers" that forms the basis of the plaintiffs' claims under §§ 1981–1983.[2]

The Supreme Court has recognized that the prudential rule regarding standing to assert the constitutional rights of third persons, "[l]ike any other rule ... should not be applied where its underlying justifications are absent." *Singleton v. Wulff,* 428 U.S. 106, 114, 96 S.Ct. 2868, 2874, 49 L.Ed.2d 826 (1976). In determining third party standing, courts are to consider "the relationship of the litigant to the person whose rights are being asserted; the ability of the person to advance his own rights; and the impact of the litigation on third party interests." *Caplin & Drysdale,* 491 U.S. at 623, n. 3, 109 S.Ct. at 2651, n. 3. *See, South–Suburban Housing Center v. Greater South Suburban Board of Realtors,* 935 F.2d 868, 879 (7th Cir.1991).

In examining the relationship between the plaintiffs and the Hispanic and Jamaican prospective migrant workers whose rights they seek to vindicate, the court must examine "whether the enjoyment of the [prospective migrant workers'] right is inextricably bound up with the activity the [plaintiffs' wish] to pursue." *Singleton,* 428 U.S. at 114, 96 S.Ct. at 2874. In this case, it is doubtful whether the plaintiffs have demonstrated a "true relationship" between their interest in pursuing the purchase of the particular parcel of real estate and, thereafter, making it attractive for migrant workers to work for them in their fields, and the constitutional rights of specific prospective migrant worker "tenants." *See, South–Suburban Housing Center,* 935 F.2d at 879. To be sure, the plaintiffs wanted to purchase the subject parcel of

---

**2.** It is not clear from the record what Patrick and Michael Lauer's race or ethnicity are. It is reasonable to assume, however, that they are neither Hispanic or Jamaican for, if they were, such an allegation would have been made. And it is also clear that they were not the alleged targets of discrimination. Furthermore, Lauer Farms,

Inc., could not have been the target of discrimination because, "[a]s a corporation, [it] has no racial identify and cannot be the direct target of ... [defendant's] alleged discrimination." *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 262, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977).

property so that they could build migrant housing thereon. And, this court has no doubt that the migrant workers would have benefitted from the plaintiffs' efforts. However, in my view, this hardly constitutes a relationship between the plaintiffs and such unidentified, unspecified "Hispanic and Jamaican" migrant workers such that the plaintiffs are "fully, or very nearly, as effective a proponent of the [constitutional] right as" the migrant workers. *Singleton,* 428 U.S. at 115, 96 S.Ct. at 2874.

In *South–Suburban Housing Center, supra,* the Seventh Circuit Court of Appeals rejected the standing of the "Greater South Suburban Board of Realtors and National Association of Realtors" to pursue the equal protection claims of potential black home buyers. In doing so, it noted that "one of the prudential reasons for the rule against third party standing is that 'the courts should not adjudicate [constitutional] rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not.' ... We refuse to address the constitutional issue of an equal protection violation until such time as it is presented by a potential home buyer, as we, like the Supreme Court, believe that 'third parties themselves usually will be the best proponents of their own rights.' " *South–Suburban Housing Center,* 935 F.2d at 879. Like "the Realtors" in *South–Suburban Housing Center,* the motivation of the Lauers in the instant case is clearly economic. And, although there is nothing wrong with such motivation (indeed, we live in a capitalist economy) it, in my view, does not provide sufficient basis for the court to conclude that the migrant workers' right to be free from housing discrimination is "inextricably bound up with" the Lauers' interest in purchasing the vacant gravel pit. *Singleton,* 428 U.S. at 114, 96 S.Ct. at 2873.

What about the second potential exception to the rule against third party standing? That exception turns upon the "ability of the [third party] to advance his own rights," and whether "there is some genuine obstacle to [the personal] assertion" of the constitutional

right. *Id.* In this case, the plaintiffs argue, with some appeal, that "[m]igrant workers who were never recruited or hired because the camp was never allowed to exist are unable to assert a claim on their own behalf. Since the camp was denied, the identities of the migrant workers are unknown. Thus, plaintiffs are the only identifiable party available to assert constitutional claims. It was Defendant's own unlawful action which prevented the particular migrant workers from being identifiable; Defendant should not be allowed to benefit from its own wrong." (Plaintiffs' Brief, pp. 8–9).

However, the undisputed facts demonstrate that there are 27 migrant worker camps located in Waushara County. Given the fact that there are such a large number of camps and that, presumably, these camps are occupied by hundreds, if not thousands, of migrant workers, there does not seem to be a "genuine obstacle" to those migrant workers' assertion of their own constitutional rights. It is true that the incentive they might have to assert their constitutional rights are lessened by the fact that there are other camps where they might reside. But this does not mean, therefore, that there is a genuine obstacle to their being able to assert such rights, such that the plaintiffs are the only ones who can effectively assert them. To the contrary, that there are other camps may explain why the migrant workers might either wish not to assert such rights or would be "able to enjoy them regardless of whether the in-court litigant is successful or not." *South–Suburban Housing Center,* 935 F.2d at 879.

But, even assuming that the enjoyment of the migrant workers' rights to housing in the Town of Oasis is inextricably bound up with the activity that the plaintiffs wish to pursue, *Singleton,* 428 U.S. at 114, 96 S.Ct. at 2873, and even assuming that there is "some genuine obstacle to [the migrant workers'] assertion" of their constitutional rights, *Id.,* at 114, 96 S.Ct. at 2873, I am nevertheless not persuaded that the plaintiffs have satisfied the third factor in the consideration of whether a party has met the prudential standing requirement.

As stated, the final factor considered in determining whether an exception to the rule against third party standing is warranted is "the impact of the litigation on third party interests." *Caplin & Drysdale,* 491 U.S. at 623, n. 3, 109 S.Ct. at 2651, n. 3; *see also, South–Suburban Housing Center,* 935 F.2d at 880. Here, the plaintiffs claim that they have suffered damages in the form of economic loss. Thus, they seek, among other things, compensatory damages and punitive damages. To be sure, they seek declaratory and injunctive relief, i.e., ordering defendants to cease and desist from any further discriminatory conduct. However, such relief, both monetary and injunctive, will not benefit the would be residents of the plaintiffs' proposed migrant housing camp. This is for the simple reason that the property which the plaintiffs wanted to purchase for the purpose of constructing the migrant housing camp thereon, has been "sold to a different buyer and is no longer available for purchase by the Plaintiffs." (Amended Complaint, ¶ 18). Moreover, the plaintiffs "do not have an alternative site available for building the migrant housing they had planned." *Id.*

In short, even assuming the plaintiffs were to succeed on their claims under §§ 1981, 1982 and 1983, the unidentified, unspecified migrant workers who might have arguably benefitted from living at the plaintiffs' migrant camp will not at all benefit from the relief the plaintiffs seek.[3] Granted, the plaintiffs do seek relief in the form of an injunction that the defendant not engage in future discriminatory conduct. But that relief would be little more than hollow for those prospective migrant workers (whoever they might be) who would have liked to live at the plaintiffs' migrant housing camp (if there are any such migrant workers). Indeed, such an injunction would do little more than direct the defendant to follow the law in the future.

The courts of the United States are to decide justiciable cases and controversies—

not make abstract pronouncements and issue proclamations. Given the fact that the relief sought by the Lauers would not benefit the individual "Hispanic or Jamaican" migrant workers who were allegedly discriminated against by the defendant's conduct in 1993, the plaintiffs lack standing to pursue claims under §§ 1981, 1982 and 1983.

In conclusion, the plaintiffs have not satisfied the requirement of standing such as to be allowed to pursue their claims, pursuant to 42 U.S.C. §§ 1981, 1982 and 1983. Because they have not, the defendant's motion for summary judgment dismissing the third, fourth and fifth claims of plaintiffs' amended complaint is granted and those claims are dismissed.

**2. Plaintiffs' Claims Under the Fair Housing Act.**

The Fair Housing Act prohibits discrimination in housing on the basis of race, color, religion, national origin, handicap and familial status. 42 U.S.C. § 3601 *et seq.* Most significantly, the Supreme Court considers the language of the FHA "broad and inclusive." *Trafficante v. Metropolitan Life Insurance Company,* 409 U.S. 205, 209, 93 S.Ct. 364, 366–67, 34 L.Ed.2d 415 (1972). Indeed, for that reason at least one court has held that the FHA be given " 'a generous construction' in order to carry out a 'policy that Congress considered to be of the highest priority.' " *United States v. California Mobile Home Park Management Co.,* 29 F.3d 1413, 1416 (9th Cir.1994) (quoting *Trafficante,* 409 U.S. at 209, 93 S.Ct. at 366–67). That having been said, I now turn to the parties' arguments.

**A. Have plaintiffs failed to satisfy their initial burden of presenting a prima facie case of discrimination?**

■ Unlike its attack on the plaintiffs' claims under the civil rights laws, i.e., 42

---

**3.** In this respect, the plaintiffs' argument for standing is not unlike that of the plaintiff developer in *United States General, Inc. v. City of Joliet,* 432 F.Supp. 346 (N.D.Ill.1977). In that case, the court noted that "the damages requested would not benefit the third parties in any way and the opportunity to alleviate their injury is one reason for granting standing ... Here ... plaintiff does not seek a mandatory injunction

requiring the City of Joliet to issue the building permits. Apparently, it no longer wishes to construct the public housing. Thus, if plaintiff prevailed on the merits, it would obtain damages for itself and the minority group families would receive no benefit. For these reasons, plaintiff lacks standing to bring this action solely as a result of the indirect relationship between it and the minority group families." *Id.,* at 351.

U.S.C. §§ 1981–1983, the Board of Adjustment does not maintain that the plaintiffs lack standing to pursue claims under the Fair Housing Act. This is for good reason. Other than the requirement that the purported injury be "likely to be redressed by a favorable decision," injury in fact is the only requirement to achieve standing under the Fair Housing Act. The United States Supreme Court has held that:

> Congress intended standing under § 812 [of the Fair Housing Act] to extend to the full limits of Art. III and ... the courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section ... Thus, the sole requirement for standing to sue under Section 812 is the Art. III minima of injury in fact: that the plaintiff alleged that as a result of the defendant's actions he has suffered a 'distinct and palpable injury,' ... *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

*Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982); *see also, South–Suburban Housing Center*, 935 F.2d at 878.

 Instead, the defendant claims that the plaintiffs have failed to satisfy their burden of presenting a prima facie case of discrimination under the Fair Housing Act and, therefore, their claims under that Act should be dismissed. In support of its argument, the defendant cites *Gamble v. City of Escondido*, 104 F.3d 300 (9th Cir.1997), for the elements of a prima facie case in a setting where the plaintiff's claim of discrimination is based on a governmental defendant's denial of a conditional use permit:

1. Plaintiff is a member of a protected class;

2. Plaintiff applied for a conditional use permit and was qualified to receive it;

3. The conditional use permit was denied despite plaintiff being qualified; and

4. Defendant approved a conditional use permit for a similarly situated party [outside the protected class] during a period relatively near the time plaintiff was denied its conditional use permit. (Defendant's Brief, p. 14).

The defendant advances no arguments concerning the first three elements. Instead, it focuses exclusively on the fourth element and argues that the plaintiffs cannot establish a prima facie case (and that, therefore, summary judgment dismissing their FHA claims is appropriate) because "there is no evidence that the Board of Adjustment has approved a conditional use permit for another similarly situated party outside a protected class during a time relatively near the time that the plaintiffs' application was denied." (Defendant's Brief, p. 14). In other words, there is no evidence that the defendant approved a conditional use permit for a migrant worker housing project which would have housed (for example) non-Hispanic and non-Jamaican migrant workers. Moreover, argues the defendant, the evidence shows that from 1979 until 1993, eight conditional use applications for Waushara County were granted, while zero applications for conditional use permits for migrant camps were denied. And, even after the Board of Adjustment's action on the plaintiffs' application for a conditional use permit, two applications for conditional use permits involving the establishment or expansion of migrant camps have been approved, while zero such requests have been denied. (Defendant's Brief, pp. 14–15).

Plaintiffs' response to the defendant's argument is straight forward. They argue that to show a violation of the FHA in a disparate treatment case (which they acknowledge this is), i.e., one requiring the proof of intent, a plaintiff need only show "that his status as part of a protected group was in some part the motivating factor for the county's denial of the permit," *citing, Baxter v. City of Belleville, Illinois*, 720 F.Supp. 720, 732 (S.D.Ill. 1989).

In *Baxter*, the court found that evidence presented at the Zoning Board hearing supported the plaintiff's claim that the irrational fear of AIDS was at least a motivating factor in the City's refusal to grant a special use permit allowing him to establish a home for AIDS patients. *Id.* at 732. The evidence at

the hearing included questions concerning the Zoning Board members' fear of AIDS, including "how potential residents would be screened; supervision of the residents; effect on the junior high school across the street; how Baxter would handle sanitation, including disposal of body fluids; why he chose Belleville for the residence; needs in Belleville for such a residence; and, whether Baxter, himself, was homosexual or had tested positive for the Human Immunodeficiency Virus (HIV)." *Id.* at 722. "[D]ue to that fear, the City's actions were both intentional and specifically designed to prevent persons with HIV from residing at Our Place." *Id.* at 732. Therefore, the court granted plaintiff's motion for preliminary injunction requiring the City to allow him to open the home. *See also, Support Ministries for Persons with AIDS, Inc. v. Village of Waterford, New York,* 808 F.Supp. 120 (N.D.N.Y.1992).

The plaintiffs proceed to argue:

> As in *Baxter* and *Support Ministries,* this case involves a decision made following receipt of numerous discriminatory remarks by others. Plaintiffs assert that it is discrimination for a decision-maker to base his/her decision on the discriminatory animus of his/her constituents.

> > On the other hand, a decisionmaker has a duty not to allow illegal prejudices of the majority to influence the decision-making process. A racially discriminatory act would be not less illegal simply because is enjoys broad political support. Likewise, if an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself become tainted with discriminatory intent even if the decisionmaker personally has no strong views on the matter.

> *A.F.A.P.S. v. Regulations and Permits Administration,* 740 F.Supp. 95, 104 (D.Puerto Rico 1990). 'The critical inquiry in such cases must be whether the elected official is appropriately responding to a legitimate concern or is unlawfully catering to and effectuating the constituent's bigot-

ry.' *Contreras v. City of Chicago,* 920 F.Supp. 1370, 1399 (N.D.Ill.1996).

(Plaintiff's Brief, p. 12).

The plaintiff points to allegedly racist and discriminatory remarks made at both the meetings of the Oasis Town Board and of the Board of Adjustment, as well as to the expressed unfounded fears, allegedly used to mask the real reasons for the public's opposition to the migrant camp in the Town of Oasis, and argue that they have shown sufficient evidence of discriminatory intent to survive a motion for summary judgment.

In reply, the defendant reiterates the elements of a prima facie case as set forth in *Gamble,* which it claims the plaintiffs must meet before they can proceed to trial on the FHA claims. Because the plaintiffs cannot demonstrate the fourth element of such prima facie case, the defendant asserts that the plaintiffs' FHA claims can proceed no further.

In my view, the defendant places undue reliance on *Gamble.* To be sure, the court in *Gamble* analyzed the plaintiff's claim under Title VII's 3–step *McDonnell Douglas/Burdine* burden-shifting analysis. *Gamble,* 104 F.3d at 305 (*citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Under the *McDonnell Douglas* method, (a) the plaintiff must prove each of the elements of his prima facie case; (b) if the plaintiff carries his initial burden of establishing a *prima facie* case, the employer then has the burden of "articulating" a legitimate, non-discriminatory reason for the adverse action about which the plaintiff complains; and, (c) once the employer articulates a legitimate non-discriminatory reason for the actions being challenged, the burden shifts back to the plaintiff, to prove that the proffered reason was not the real reason for the action (i.e., it was pretextual). *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *McDonnell Douglas Corp., supra.* Such burden-shifting analysis is appropriate in a discrimination claim that a plaintiff is attempting to prove indirectly, as was the situation in *Gamble.* Indeed, in *Gamble* the court explicitly held that, "the record is devoid of

any evidence of intent or motive to discriminate." *Gamble,* 104 F.3d at 306.

As stated by the 7th Circuit Court of Appeals in *Collier v. Budd Company,* 66 F.3d 886 (7th Cir.1995), (an age discrimination case), "the *McDonnell Douglas* method is a substitute for proving discrimination by direct evidence, and courts allow the burden-shifting framework because employers do 'not normally memorialize an intention to discriminate on the basis of age.' *Castleman v. Acme Boot Company,* 959 F.2d 1417, 1420 (7th Cir.1992). The *prima facie* case and specifically its fourth prong, are meant to identify situations were the 'actions taken by the employer, . . . if unexplained, are more likely than not based on the consideration of impermissible factors.' *Allen v. Diebold, Inc.,* 33 F.3d 674, 678 (6th Cir.1994)." *Collier,* 66 F.3d at 890. In other words, the *McDonnell Douglas* method of proof can be used in those cases where a plaintiff does not have direct proof of discrimination.

But, the *McDonnell Douglas'* burden-shifting method is not the only way a plaintiff can prove a discrimination claim. A plaintiff can also prove discrimination by submitting, or presenting, enough evidence, whether direct or, more commonly, circumstantial to create a triable issue of whether the adverse action of which he complains had a discriminatory motivation—for example, in the employment context, whether he was fired, or denied a promotion, or not hired, or paid less, because of the racial or other protected group to which he belongs. *Wallace v. SMC Pneumatics,* 103 F.3d 1394, 1397 (7th Cir.1997). In the case at bar, the plaintiffs have such evidence. Therefore, reliance on the *McDonnell Douglas* analysis is not necessary.

In this case, the undisputed material facts as presented by the parties by way of their Local Rule 6.05 filings demonstrate that on or about July 6, 1993, the Town Board of the Town of Oasis heard objections from local residents concerning approval of the plaintiffs' conditional use permit by the Waushara County Planning and Zoning Committee. Many of the comments presented by the local citizens at the Town Board meeting were of a discriminatory and racist nature against migrant workers and their families. (Plaintiffs'

FF, Nos. 9, 10 and 11). Furthermore, many comments and letters by local residents were presented at the July 15, 1993, Board of Adjustment meeting. Many of these were of a discriminatory and racist nature against "Mexicans," migrant workers and their families. (Plaintiffs' Findings of Fact No. 14).

Of course, this court is not in a position to conclude at this time that the Board of Adjustment's decision to deny the plaintiffs' application for a conditional use permit was based on illegal discrimination. That is an issue left for trial. It is enough to say, however, that, construing the evidence in the light most favorable to the plaintiffs and drawing all justifiable inferences in their favor, they have produced enough evidence to show that they are entitled to go to trial on the issue of the defendant's intent. After all, "[a] decision-maker has a duty not to allow illegal prejudice of the majority to influence the decision making process. A . . . discriminatory act would be no less illegal simply because it enjoys broad public support. Likewise, if an official act is performed simply in order to appease the discriminatory viewpoints of private parties, that act itself becomes tainted with discriminatory intent even if the decision-maker personally has no strong views on the matter." *Association of Relatives and Friends of AIDS Patients,* 740 F.Supp. at 104.

In conclusion, to the extent that the defendant seeks summary judgment dismissing plaintiffs' claim under the FHA for failure to make out a prima facie case, the defendant's motion is **DENIED.**

**B. Does the vacant land for which plaintiffs sought a conditional use permit constitute a "dwelling" subject to the Fair Housing Act?**

■ The Board of Adjustment argues that, because the vacant land for which the Lauers sought a conditional use permit is not a "dwelling" under the Fair Housing Act, their claims under that Act must be dismissed. I disagree.

As stated, the plaintiffs' amended complaint asserts two claims under the Fair Housing Act. Their first claim asserts a viola-

tion of 42 U.S.C. § 3604. Their second claim asserts a violation of 42 U.S.C. § 3617.

The relevant portions of § 3604 upon which the plaintiffs rely in asserting their first claim are found at §§ 3604(a) and 3604(b).[4] 42 U.S.C. § 3604(a) makes it unlawful to "... refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." · In turn, 42 U.S.C. § 3604(b) makes it unlawful, "[t]o discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."

42 U.S.C. § 3617, upon which section the plaintiffs rely in asserting their second claim, makes it unlawful to "... coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by ... [42 U.S.C. § 3604]."

Of course, critical to the determination of whether or not the defendant violated either or both of the above sections of the Fair Housing Act is whether the prospective migrant workers were deprived of a "dwelling." 42 U.S.C. § 3602(b) defines "dwelling" to mean:

> ... any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one or more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any building, structure, or portion thereof.

Thus, the issue is crystallized. Were the structures, i.e., trailers, that the plaintiffs intended to place on the parcel of land they proposed to purchase "designed or intended for occupancy as, a residence by one or more

families ..."? Citing *Woods v. Foster*, 884 F.Supp. 1169 (N.D.Ill.1995) and *Baxter v. City of Belleville*, 720 F.Supp. 720 (S.D.Ill. 1989), the Board of Adjustment argues that such structures would not have been residences. In response, the plaintiffs argue that such structures would have been captured within the meaning of "dwelling" under § 3602. In advancing such position, they rely primarily on *United States v. Columbus Country Club*, 915 F.2d 877 (3d Cir.1990), and *Villegas v. Sandy Farms, Inc.*, 929 F.Supp. 1324 (D.Or.1996).

The defendant argues that the district court in *Woods v. Foster, supra,* adopted the definition of the term "residence" that had been first employed in *U.S. v. Hughes Memorial Home,* 396 F.Supp. 544, 548–49 (W.D.Va.1975). That definition of "residence" is, "[a] temporary or permanent dwelling place, abode or habitation to which one intends to return as distinguished from a place of temporary sojourn or transient visit." *Woods,* 884 F.Supp. at 1173, *citing, Hughes,* 396 F.Supp. at 549.

In *Woods,* the building, or portion thereof, in question was a homeless shelter. The court opined that is was a dwelling for purposes of the FHA. In the view of the *Woods* court, the homeless shelter provided a residence for those in need of shelter; the homeless were not visitors or those on a temporary sojourn in the sense of motel guests. Indeed, the court opined that, "[a]lthough the Shelter is not designed to be a place of permanent residence, it cannot be said that the people who live there do not intend to return—they have nowhere else to go. As recognized by the *Hughes* [*United States v. Hughes Memorial Home,* 396 F.Supp. 544 (W.D.Va.1975)] and *Baxter* [*Baxter v. City of Belleville,* 720 F.Supp. 720 (S.D.Ill.1989)] courts, the length of time one expects to live in a particular place is not the exclusive factor in determining whether the place is a residence or a 'dwelling.' *Because the people who live in the Shelter have nowhere else to 'return to,' the Shelter is their residence* in the sense that they live there and not at any

---

4. As the defendant notes in its brief, the plaintiffs' reference to § 3604(h) of Title 42 is, pre-

sumably, a typographical error.

other place." *Woods,* 884 F.Supp. at 1173–74. (Emphasis supplied). It is this language upon which the defendant in the instant case hangs its argument.

In the defendant's view, the structures which the plaintiffs intended to place on the parcel of land in question could not be considered to have been residences precisely because the prospective inhabitants of those structures, i.e., migrant workers, would have had another place to "return to." In other words, they were "transient" occupants. In that respect, according to the defendant, the prospective migrant worker inhabitants would not be at all like people living at a homeless shelter, such as was the case in *Woods, supra,* but would instead be like motel guests. *See, Patel v. Holley House Motels,* 483 F.Supp. 374 (S.D.Ala.1979).

To be sure, the prospective migrant workers who would have inhabited the structures to be placed on the property in question may very well have had other places "to return to" at the end of the summer growing season. However, to say that the structures for the migrant workers would have therefore constituted "place[s] of temporary sojourn or transient visit" not unlike motel rooms is to deny reality. As the undisputed facts in this case demonstrate, the migrant workers would have been expected to reside in such structures from May through at least September, i.e., four to five months. Even if they had other structures in which they resided for the remaining portion of the year, that does not mean that the structures at the migrant worker camp were not places that they would "return to." To the contrary, they would have returned to those structures every night for four to five months.

In short, because these structures would have been occupied by the migrant workers and their families for at least four to five months of the year, such structures would have been far more than mere places of temporary sojourn or transient visit. Just as a homeless shelter is its occupants' residence, so too, the migrant camp structures would have served as the migrant workers' residences for so long as they worked the plaintiffs' fields. The nature of the migrant workers' occupancy would have resembled that of

a resident far more than that of a motel guest. *See, Villegas,* 929 F.Supp. at 1328. Far from being transient visitors, the migrant workers would have been more akin to "seasonal" lodgers. Accordingly, the structures in which they would have resided would have been similar to the seasonal bungalows in *United States v. Columbus Country Club,* 915 F.2d 877 (3d Cir.1990), or the time share properties in *Louisiana Acorn Fair Housing v. Quarter House,* 952 F.Supp. 352 (E.D.La. 1997), both of which were found to be "dwellings" for purposes of the FHA.

In sum, courts have given the FHA a generous construction and have found that summer bungalows, *United States v. Columbus Country Club, supra,* farm labor camps, *Hernandez v. Ever Fresh Company,* 923 F.Supp. 1305 (D.Or.1996), an AIDS hospice, *Baxter v. City of Belleville, Illinois, supra,* a children's home, *United States v. Hughes Memorial Home, supra,* a homeless shelter, *Woods v. Foster, supra,* a nursing home, *Hovsons, Inc. v. Township of Brick,* 89 F.3d 1096 (3d Cir.1996), and a cooperative apartment building, *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032 (2d Cir.1979), are all "dwellings" under the FHA. In making these determinations, courts have considered the length of time a person stayed at the "residence" and whether the person intended to return.

I am persuaded that four to five months is sufficient time to render the structures which would have been placed on the subject parcel of property "dwellings" within the meaning of the FHA. Far from being akin to motel rooms, these structures would have provided the prospective migrant workers and their families with a place to return to on a daily basis and a place from which to seek shelter from the elements on a daily and nightly basis for so long as the growing and harvesting seasons lasted. For all of the above reasons, the defendant's motion for summary judgment seeking dismissal of the plaintiffs' claims under the FHA is **DENIED.**

**3. The Plaintiffs' State Law Claim Under the Wisconsin Open Housing Act, § 106.04, Wis. Stats.**

██ The plaintiffs' final claim is one based on Wisconsin state law. Specifically, the plaintiffs allege:

42. Defendant WBA violated the Wisconsin Open Housing Act, § 101.22, Wis. Stats. [renumbered to § 106.04, Wis. Stats.], by denying equal opportunity for housing, in that Defendant, as a political subdivision, hindered the orderly removal or prevention of all discrimination in housing because of the race, color, family status, lawful source of income, national origin, and/or ancestry of the camp's prospective occupants.

43. Defendant WBA allowed illegal prejudices of the majority to result in the discriminatory denial of a conditional use permit. Defendant WBA's official act performed in order to appease the discriminatory viewpoints of private parties was itself tainted with discriminatory intent and had a discriminatory effect.

44. As a result of Defendant WBA's unlawful conduct, Plaintiff suffered damages in the form of economic loss and the loss of civil rights.

45. The course of conduct of the Defendant WBA as described above was deliberately undertaken and was committed in a wanton, wilful, and reckless disregard of Plaintiffs' rights and was attended by malice and vindictiveness on the part of said Defendant.

46. As a result of Defendant's course of conduct, Plaintiffs have suffered damages in the form of economic loss and the loss of civil rights.

(Amended Complaint, pp. 10–11).

The defendant argues that the plaintiffs' state law claim should be dismissed on two grounds. First, the defendant argues that the plaintiff's state law claim must be dismissed for the plaintiffs' failure to comply with the provisions of § 893.80(1)(b), Wis. Stats. Second, the defendant argues that the plaintiffs' state law claim must be dismissed because § 893.80(4), Wis. Stats., renders the Board of Adjustment immune from suit based upon intentional acts and based upon discretionary acts.

Section 893.80(1) provides, in pertinent part:

(1) ... no action may be brought or maintained against any .... political corpora-

tion, governmental subdivision or agency thereof ... upon a claim or cause of action unless:

(a) Within 120 days after the happening of the event giving rise to the claim, written notice of the circumstances of the claim signed by the party, agent or attorney is served on the ... political corporation, governmental subdivision or agency.... Failure to give the requisite notice shall not bar action on the claim is the ... corporation, subdivision or agency had actual notice of the claim and the claimant shows to the satisfaction of the court that the delay or failure to give the requisite notice has not been prejudicial to the defendant ... corporation, subdivision or agency ...; and

(b) A claim containing the address of the claimant and an itemized statement of the relief sought is presented to the appropriate clerk or person who performs the duties of a clerk or a secretary for the defendant ... corporation, subdivision or agency and the claim is disallowed.

Because the plaintiffs failed to present a written, itemized claim with the County Clerk pursuant to § 893.80(1)(b), Wis. Stats., the defendant argues that this court does not have jurisdiction over the plaintiffs' claim under the Wisconsin Open Housing Act. In response, the plaintiffs do not dispute that they never presented a claim under § 893.80(1)(b). Instead, they argue that they should be relieved of the responsibility of presenting such a claim because they filed a complaint with the Wisconsin Department of Industry, Labor and Human Relations Equal Rights Division ("ERD") on February 11, 1994, along with an amended complaint on September 21, 1994. In their view,

... since Wis. Stats. § 893.80 is not designed to prevent housing discrimination, it must be interpreted in such a manner to avoid undermining claims properly brought under Wisconsin's Open Housing Act. The purpose of the Open Housing Act is to "render unlawful discrimination in housing." Wis. Stats. § 106.04(1) (1995–96). To accomplish this goal, a complaint procedure has been developed "to provide an

impartial and speedy procedure for resolving disputes of alleged housing discrimination." Wis. Admin. Code § ILHR 220.01 (April, 1996). The notice of claim statute should be reconciled with this procedure such that compliance with the process developed by the Equal Rights Division satisfies the requirements of § 893.80. Namely, if a proper claim is brought under Wisconsin's Open Housing Act, as it was done here, then the statutory requirements of Wis. Stats. § 893.80 are likewise satisfied. (Plaintiffs' Brief, p. 19). As stated, there seems to be no dispute that the plaintiffs neither served a notice of claim under § 893.80(1)(a) nor presented a claim under § 893.80(1)(b). Indeed, the affidavit of John Benz, the County Clerk of Waushara County, clearly demonstrates that a "diligent search of [Waushara] County records, [reveals] no evidence that Lauer Farms, Inc., Patrick Lauer and/or Michael Lauer ever filed an itemized claim for damages with the County Clerk's Office or with the Waushara County Board of Adjustment." (Affidavit of John Benz, attached to defendant's Motion for Summary Judgment).

In my opinion, the defendant's motion to dismiss the plaintiffs' state law claim for failure to present a claim under § 893.80 must be granted. The undisputed facts show that no claim was ever presented. Wisconsin case law makes clear that presenting such a claim is a jurisdictional prerequisite to bringing a suit for damages against a governmental body such as the Board of Adjustment.

In *Orthmann v. Apple River Campground, Inc.*, 757 F.2d 909 (7th Cir.1985), the seventh circuit, in affirming the dismissal of a complaint against the Village of Somerset, held:

A statute of Wisconsin provides that a suit may not be brought against a public agency unless two conditions are satisfied: "written notice of the circumstances of the claim" must be served on the agency "within 120 days after the happening of the event giving rise to the claim," unless the "agency had actual notice of the claim and the claimant shows to the satisfaction of the court that the delay or failure to give the requisite notice has not been prejudicial to the defendant" agency, Wis. Stats.

§ 893.80(1)(a); and "a claim containing the address of the claimant and an itemized statement of the relief" sought "must be presented to the appropriate clerk [for the defendant agency] ... and the claim ... disallowed," *Id.* § 893.80(1)(b). No claim was ever presented to the village. § 893.80(1)(b) unlike (1)(a) contains no excuses, and the Wisconsin courts interpret its requirements strictly (as must we in this diversity case, since the Wisconsin statute clearly is "substantive" for purposes of applying the rule of *Erie RR v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938)). *See Rabe v. Outagamie County*, 72 Wis.2d 492, 499–501, 241 N.W.2d 428, 432–33 (1976); Cf. *Mannino v. Davenport*, 99 Wis.2d 602, 614–15, 299 N.W.2d 823, 829 (1981). Orthmann is therefore barred from suing the village.

*Orthmann*, 757 F.2d at 911.

Recently, the Wisconsin Court of Appeals stated the following with respect to § 893.80(1):

The statute has two requirements. First, a claimant must present the municipality with "written notice of the circumstances of the claim signed by the party ..." § 893.80(1)(a), Stats.

\* \* \* \* \* \*

Second, a claimant must present the municipality with "[a] claim containing the address of the claimant and an itemized statement of the relief sought ..." § 893.80(1)(b), Stats., amended by 1995–96 Wis. Act. 158 § 18. Under (b) the claim must: "1) identify the claimant's address; 2) contain an itemized statement of the relief sought; 3) be submitted to the City Clerk; and 4) be disallowed by the city." [DNR v.] *City of Waukesha*, 184 Wis.2d at 197–98, 515 N.W.2d at 895. Two principles help determine the sufficiency of a claim under subsection (b): (1) the notice must provide the municipality with the information necessary to decide whether to settle the claim; and, (2) the notice must preserve bone fide claims. . . .

The statute first requires that a notice of claim contain the address of the claimant . . .

Second, the claim must contain an itemized statement of the relief sought. . . .

Third, the notice of claim must be "presented to the appropriate clerk or person who performs the duties of a clerk or secretary for the defendant . . . § 893.80(1)(b), Stats. The key is that the claim be presented to a proper representative, whether that be the clerk, the city attorney, or another more appropriate individual . . .

*State of Wisconsin v. Town of Linn*, 205 Wis.2d 426, 556 N.W.2d 394, 399–401 (Ct. App.1996).

In other words, there are two fundamental steps that the plaintiffs must have taken in order to have discharged their obligation under § 893.80(1). First, they must have served a notice of claim. Second, they must have presented a claim. Perhaps, as the plaintiffs argue, the complaint that they filed with the Equal Rights Division could have served as the notice of the circumstances of claim required by § 893.80(1)(a). However, the complaint that they filed with the Equal Rights Division clearly did not constitute presentment of a claim under § 893.80(1)(b).

Most significantly, the complaint filed with the Equal Rights Division did not include "an itemized statement of the relief sought . . ." as required by § 893.80(1)(b). The Wisconsin courts have made clear that the essential purpose of the notice of claim statute is to " 'afford the municipality an opportunity to compromise and settle [the] claim without litigation.' " *Figgs v. City of Milwaukee*, 121 Wis.2d 44, 53–54, 357 N.W.2d 548 (1984), *citing, Gutter v. Seamandel*, 103 Wis.2d 1, 11 308 N.W.2d 403 (1981). The plaintiff's ERD

complaint did not satisfy such essential purpose. Indeed, their complaint recounted what they believed to be the discriminatory conduct. But nowhere in that complaint did the plaintiffs present even a generalized statement, much less an itemized statement, of the relief they were seeking. As such, their complaint did not reasonably afford the Board of Adjustment the "opportunity to compromise and settle [such] claim without litigation." *Figgs*, 121 Wis.2d at 54, 357 N.W.2d 548.

In this respect, their situation is similar to that of the plaintiffs in *Medley v. City of Milwaukee*, 969 F.2d 312 (7th Cir.1992), whose service of a complaint on HUD was found not to constitute the presentment of a claim with the City of Milwaukee in compliance with § 893.80. The Lauers' situation is also similar to that of the plaintiffs in *Probst v. Winnebago County*, 208 Wis.2d 280, 560 N.W.2d 291 (Ct.App.1997). In *Probst* the court found that the filing of a federal district court action did not constitute presentment of a claim and, therefore, did not constitute compliance with the mandates of § 893.80(1)(b), Wis. Stats.

In sum, the plaintiffs in this action neither ever served a notice of claim nor, more significantly, ever presented a claim complying with the provisions of § 893.80, Wis. Stat. Accordingly, their claim for relief under the Wisconsin Open Housing Act must be dismissed for lack of jurisdiction.[5]

Finally, the defendant argues that the plaintiffs' state law claim under the Wisconsin Open Housing Act must be dismissed because the Board of Adjustment is immune from suit based on intentional acts and based upon discretionary acts, pursuant to § 893.80(4), Wis. Stats.[6] However, it is not

---

**5.** The plaintiffs rely heavily on *Fritsch v. St. Croix Central School District*, 183 Wis.2d 336, 515 N.W.2d 328 (Ct.App.1994), in arguing that they should be allowed to proceed on their state claim under the Wisconsin Open Housing Law. However, their reliance on *Fritsch* is misplaced. In *Fritsch*, the court held that the defendant school district was estopped from asserting as a defense the provisions of § 893.80(1)(b), Wis. Stats. However, there is no showing here, as there was in *Fritsch*, that the defendant's action or non-action had induced the plaintiffs' reliance there-

on, either in the form of action or non-action, to their detriment. *Fritsch*, 183 Wis.2d at 344, 515 N.W.2d at 331.

**6.** Section 893.80(4), Wis. Stats., provides that: "no suit may be brought against any . . . political corporation, governmental subdivision or any agency thereof for the intentional torts of its officers, officials, agents or employes nor may any suit be brought against such corporation, subdivision or agency . . . or against its officers, officials, agents or employes for acts done in the

necessary for me to address such arguments. This is because I have already found dismissal of the plaintiffs' state law claim to be appropriate on other grounds.

**NOW, THEREFORE, IT IS ORDERED** that the defendant's motion for summary judgment is **GRANTED** in part and **DENIED** in part;

**IT IS FURTHER ORDERED** that the defendant's motion for summary judgment seeking dismissal of the plaintiffs' claims under 42 U.S.C. §§ 1981, 1982 and 1983 be **GRANTED** and those claims are dismissed;

**IT IS FURTHER ORDERED** that the defendant's motion for summary judgment seeking dismissal of the plaintiffs' claims under the Fair Housing Act, i.e., 42 U.S.C. §§ 3604 and 3617 be **DENIED;**

**IT IS FURTHER ORDERED** that the defendant's motion for summary judgment seeking dismissal of the plaintiffs' state law claim under § 106.04, Wis. Stats., be **GRANTED** and such claim is dismissed.

**SO ORDERED.**

exercise of legislative, quasi-legislative, judicial or quasi-judicial functions.''