133 F.3d 975
 72 Empl. Prac. Dec. P 45,156
 James J. AHERN, William T. Cox, Jr., Kenneth Deiml, Noreen
Nagle, Charles F. McCabe, Donald F. Kimball, and
Mary Ann Timlin, Plaintiffs-Appellants,
v.
BOARD OF EDUCATION OF THE CITY OF CHICAGO, et al.,
Defendants-Appellees.
 No. 96-2170.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 16, 1997.
Decided Jan. 9, 1998.
Rehearing and Suggestion for Rehearing En Banc Denied Feb. 19, 1998.
 
 Robert E. Williams, Terrence Buehler, Susman, Buehler & Watkins, Chicago, IL, James Schwartz (argued), Schwartz & Spalding, Jeffrey E. Sachse, Schwartz, Sachse & Caravette, Chicago, IL, Eric Secoy, Jamaica Plain, MA, for Plaintiffs-Appellants.
 Robert S. Markin, Kathleen M. Gibbons, City of Chicago Board of Education, Chicago, IL, William J. Quinlan, Rockford Public Schools, Rockford, IL, for Defendants-Appellees.
 Before ESCHBACH, COFFEY, and DIANE P. WOOD, Circuit Judges.
 DIANE P. WOOD, Circuit Judge.
 
 
 1
 Seven former principals ("the Principals") of Chicago public schools lost their jobs when the responsible Local School Council (LSC) either fired them or did not renew their contracts. The Principals believe that these actions violated their rights under a 1977 Desegregation Plan that the Chicago Board of Education ("the Board") adopted in response to federal pressure to bring the Chicago School District ("the District") into compliance with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. The district court, Judge Charles P. Kocoras presiding, found that the 1977 Plan had been superseded by a 1980 Consent Decree and that the Board was therefore entitled to summary judgment. Ahern v. Board of Educ., 1996 WL 134257 (N.D.Ill. Mar. 22, 1996). In so doing, Judge Kocoras agreed with several of his colleagues on the district court, who had adjudicated basically the same claim in earlier cases and who also had concluded that the 1977 Plan ceased to have legal force after the entry of the 1980 Decree. See Keenan v. Board of Educ., 812 F.Supp. 780 (N.D.Ill.1992) (Aspen, J.); Asllani v. Board of Educ., 845 F.Supp. 1209 (N.D.Ill.1993) (Moran, C.J.); Schnettler v. Board of Educ., 1994 WL 142958 (N.D.Ill. April 15, 1994) (Andersen, J.). After careful study of the 1977 Plan, the 1980 Decree, and the evidence the Principals proffer to suggest that the 1980 Decree is ambiguous, we have concluded that our colleagues on the district court correctly construed the 1980 Decree and that the Principals are not entitled to relief based on the 1977 Plan.
 
 
 2
 * Under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Because the Chicago School District was (and continues to be) a recipient of federal funds, it was required to comply with Title VI. In 1972, the District submitted to the then-U.S. Department of Health, Education, and Welfare (HEW) a statement of "Assurance of Compliance with the Department of Health, Education and Welfare Regulation under Title VI of the Civil Rights Act of 1964," as it was required to do under 45 C.F.R. § 80.4 in order to qualify for federal financial assistance. Two years later, HEW officials, acting through the Office for Civil Rights (OCR), initiated a compliance review of the District. In a letter dated October 6, 1975, OCR notified the District that it was violating Title VI with respect to "the issues of faculty and professional staff assignment and special bilingual instructional staff assignment and special bilingual instructional services." See In re Chicago Public Sch. Dist. # 299, at 2, Docket No. S-120 (Feb. 15, 1977) (HEW administrative opinion quoting the letter) (reprinted in Appellee Appendix at 3). That letter triggered administrative proceedings, which resulted in a February 15, 1977, opinion of HEW Administrative Law Judge Everett J. Hammarstrom finding that the District had indeed violated Title VI in those particulars. In that opinion, the ALJ concluded that "[u]nder both the Constitutional and the Title VI standard minority school children have been deprived of their right to be educated in a system operated free of racial discrimination in that assignment policies and practices of Chicago Public School officials have made for the racial identifiability of schools as intended for students of a particular race." Id. at 55.
 
 
 3
 During the time the administrative proceedings had been pending, officials from the District and the Board had been working actively to resolve their differences with the federal government. The Board had appointed a Committee on Faculty Integration on July 14, 1976, which had been asked "to develop a plan for the implementation of the provisions of Title VI of the Civil Rights Act of 1964 and which would resolve the specific issues raised by the Office for Civil Rights, Department of Health, Education and Welfare in October of 1975." Official Report of the Proceedings of the Board of Education of the City of Chicago, May 25, 1977 (reprinted in Appellant Appendix at 131). That committee, working with its counterparts from the federal government, developed the plan that eventually became the agreed Plan for the Implementation of the Provisions of Title VI of the Civil Rights Act of 1964 Related To: Integration of Faculties, Assignment Patterns of Principals, and Bilingual Education Programs ("the 1977 Plan"). At its regular meeting of October 12, 1977, the Board of Education adopted the 1977 Plan, as item 77-284 on its agenda. Official Report of the Proceedings of the Board of Education of the City of Chicago, October 12, 1977 (reprinted in Appellant Appendix at 154-155). The minutes reflect that the 1977 Plan was an agreement between the Board and HEW. Id.
 
 
 4
 Before turning to the details of the 1977 Plan, we note in passing that HEW's attention to faculty hiring and assignment of principals reflected its view (both then and now, as embodied in successor regulations of the Departments of Education, 34 C.F.R. § 100.3, and Health and Human Services, 45 C.F.R. § 80.3) that the Title VI ban against discrimination in federal programs might be violated by certain patterns of faculty and staff assignments. This was not because Title VI was seen as simply another way to reach discrimination in employment practices. To the contrary, Title VI, § 604, specifically provides that the chapter does not authorize action "by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d-3. That being said, § 2000d-3 was also "never intended as a limitation on desegregation of schools ... [including through] integration of faculty." United States v. Jefferson County Bd. of Educ., 372 F.2d 836, 883 (5th Cir.1966). Thus, HEW took (and its successors take) the correct view that Title VI authorizes remedial action if employment practices tend to exclude from participation, deny benefits to, or otherwise subject the primary beneficiaries of a federal program to discrimination in violation of 42 U.S.C. § 2000d. See, e.g., Caulfield v. Board of Educ., 632 F.2d 999, 1005 (2d Cir.1980); Jefferson County, 372 F.2d at 882-86. See also Simpson v. Reynolds Metals Co., Inc., 629 F.2d 1226, 1234 (7th Cir.1980) (approving of dicta to this effect in earlier decisions, in a case dealing with the Rehabilitation Act of 1973 § 504, 29 U.S.C. § 794); Trageser v. Libbie Rehabilitation Center, Inc., 590 F.2d 87, 89 (4th Cir.1978) (Rehabilitation Act case relying on Title VI analogy); Caulfield v. Board of Educ., 486 F.Supp. 862, 880-81 (E.D.N.Y.1979) (collecting cases indicating that faculty desegregation measures can be part of a Title VI remedy). As the Trageser court put it: "Title VI does not provide a judicial remedy for employment discrimination by institutions receiving federal funds unless (1) providing employment is a primary objective of the federal aid, or (2) discrimination in employment necessarily causes discrimination against the primary beneficiaries of the federal aid." 590 F.2d at 89 (footnotes omitted). Although it was acting before Trageser was decided, HEW was presumably following the second justification in its push for the 1977 Plan.
 
 
 5
 That Plan, as its title indicates, focused on three questions: faculty integration, assignment of principals, and bilingual education services. It contained five chapters, one dealing with each of those three subjects, and two more general chapters, Chapter IV on "Protective Principles," and Chapter V on "Presentation Activities." The Plan began with a statement stressing the voluntary nature of its adoption and the lack of any admissions relevant to the still-pending administrative proceeding. On the subject of later modifications, it stipulated that any modification had to be reflected in the written agreement of both parties. Two chapters of the Plan are of particular interest for our purposes: Chapter II, on Assignment Patterns of Principals, and Chapter IV, on the Protective Principles. Chapter II described its goal as achieving the assignment or reassignment of principals "so as to eliminate any identifiable pattern of assignment based on race or sex," with particular percentage goals to be achieved by September 1977. Substantial numbers of principals were to be transferred to different schools under the Plan, and new appointments were to be governed by it.
 
 
 6
 Chapter IV deserves a close look, as it contains the Protective Principles to which the plaintiffs before us claim they were entitled. It begins with a definition of who may invoke the Principles and a basic policy statement regarding discrimination:
 
 
 7
 Certificated members of the teaching force (which, as used in these Protective Principles, is defined to include those staff members irrespective of type of certification or type of appointment who work directly with school children or who work in the administration at any level in the Chicago public school system) will be hired, assigned, evaluated, promoted, paid, demoted, dismissed and otherwise treated without regard to race, color, sex, or national origin.
 
 
 8
 Appellee Appendix at 186. The Principles went on to assure "certificated members of the teaching force" of due process-like protections, including the right to job decisions based on "written, objective, and nondiscriminatory criteria," rights to bid on vacancies, advance notice of possible adverse actions (i.e., dismissal, demotion, or a rating of "unsatisfactory"), no reduction in compensation or other emoluments as a result of an assignment or reassignment for the purposes of faculty and principal desegregation or bilingual education, and notice to HEW of certain personnel actions.
 
 
 9
 If the District had hoped that the adoption and implementation of the 1977 Plan would put to rest its problems with Title VI compliance, it was soon disappointed. By as early as mid-1978, OCR notified the District that it had received complaints from teachers who alleged that they had been demoted or transferred in violation of the Protective Principles. Worse yet, on April 9, 1979, Thomas K. Minter, the Deputy Commissioner for Elementary and Secondary Education at HEW, wrote to Chicago School Superintendent Joseph P. Hannon to inform him that the District was not eligible for a grant under the Emergency School Aid Act (ESAA) because of its failure fully to implement the 1977 Plan and other problems. Minter's letter highlighted failures in the areas of teacher assignments, demotion of minority group personnel, classroom segregation, discrimination against children in special education and self-discipline programs, and discriminatory assignment of children to schools. The letter advised Superintendent Hannon of the steps he would need to take to secure a waiver from HEW that would allow the District to receive the school aid funds. HEW Secretary Joseph A. Califano, Jr., sent a letter to Superintendent Hannon on the same day, in which Califano described the pupil assignment issue as "[t]he most significant new matter" HEW was raising.
 
 
 10
 Over the course of the next year, the Board and the federal government engaged in a new round of intensive negotiations over the District's compliance with Title VI and its eligibility for federal funds. For this purpose, the Board constituted a new "Committee on Student Desegregation." This time, however, matters went beyond the stage of an informal agreement. On September 24, 1980, the United States filed a complaint against the Board under Title VI, HEW's regulations, the Fourteenth Amendment to the U.S. Constitution, and "the contractual assurances" made by the Board. Paragraph 15 of the complaint laid out the specific practices of the Board that had allegedly unlawfully segregated students in the Chicago schools on the basis of race and ethnic origin. Notably, para. 15(f) cited "[t]he assignment of teachers and staff to schools in such a way as to match the race of the faculties with the race of the students attending the schools." Other allegedly segregative practices included the drawing of school attendance boundaries, the adjustment of grade structures among schools, the maintenance of a racially disproportionate number of severely overcrowded and inferior schools, and the association of segregated schools with segregated housing projects.
 
 
 11
 Simultaneously with the filing of the complaint, the parties filed a proposed Consent Decree that embodied a new agreement between the Board and the U.S. Department of Education,[1] which Judge Milton Shadur signed the same day. Part I of the 1980 Decree dealt extensively with "Student Desegregation"--a subject which for the most part went beyond the scope of the 1977 Plan. It was essentially an agreement to keep working: the Board agreed to "develop and implement a system-wide plan to remedy the present effects of past segregation of Black and Hispanic students." 1980 Decree, Section I.1. The Decree gave the Board wide discretion to choose among the "broad range of constitutionally acceptable plans" that would fulfill the basic objectives set forth in the consent decree. 1980 Decree, Section I.3.1. Subpart I.6 of the Student Desegregation section dealt with the subject of bilingual education.
 
 
 12
 Part II of the 1980 Decree, which is not particularly relevant here, covered "Additional Programs and Parties." Part III was a catch-all for "Other Issues." Section III.2 expressed the Board's commitment promptly to "implement a plan to ensure that non- and limited English speaking students are provided with the instructional services necessary to assure their effective participation in the educational programs of the Chicago School District." Section III.3 took up the subject of faculty assignment, again promising a new "plan to assure that the assignment of full-time classroom teachers to schools will be made in such a manner that no school is identified as intended for students of a particular race, color or national origin." Subpart 3.1 set forth guidelines for the racial and ethnic composition of the teaching force in each school, compared with systemwide numbers, and Subpart 3.2 addressed professional staff issues in the following language:
 
 
 13
 The Board will make every good faith effort to follow professional staff assignment and transfer practices which, when taken together as a whole on a frequently reviewed periodic basis, will assure that the racial composition, the experience and the educational background of individual school faculties and administrative staff more nearly approach[ ] the city-wide proportions of minority, experienced, and more extensively trained professional staff; provided, however, that nothing in this Plan shall require the assignment or transfer of any person to a position for which he or she is not professionally qualified. The Board will not adopt or follow assignment and transfer practices which will foreseeably result in the racial identifiability of schools based on faculty or administrative staff composition or in unequal distribution of experienced and more extensively trained staff.
 
 
 14
 (footnote omitted). Subpart 3.3 concluded by giving the District the opportunity to explain any deviations from those guidelines and indicating that such deviations would not automatically constitute noncompliance with the Decree.
 
 
 15
 A year later, the Board produced at least part of the promised desegregation plan, which it had developed under the leadership of Professor Robert L. Green. On January 6, 1983, Judge Shadur issued an opinion upholding the constitutionality of the Board's plan. United States v. Board of Educ., 554 F.Supp. 912 (N.D.Ill.1983). Finally, in an order dated March 19, 1985, the original administrative proceeding that had been brought by the District on April 9, 1976, charging the Title VI violations, was dismissed. The three-member reviewing authority for the Department of Education there expressed its view that the 1980 Consent Decree had effectively addressed the questions raised in the 1976 administrative proceeding:
 
 
 16
 Under the terms of the Consent Decree, the Respondent School District agreed to implement procedures that would eliminate racial discrimination in its school system. Although the matters which are the subject of the present administrative proceeding were never referred, per se, to DOJ, the Consent Decree contained provisions covering teacher assignment and services for national origin minority students.
 
 
 17
 There remains no reason to keep this administrative proceeding open. The practical effect of the Consent Decree requires OCR to refer to DOJ any matter ripe for enforcement pertaining to the two issues which are the subject of this proceeding. In light of the fact that the parties to the Consent Decree agreed that it was "final and binding as to the issues resolved herein," the Consent Decree provides the basis for dismissing this administrative proceeding.
 
 
 18
 And so the proceeding was closed. Perhaps matters would have stayed relatively quiet if the State of Illinois had not decided to enact legislation comprehensively reforming the school systems in "cities of over 500,000 inhabitants"--read, Chicago. But it did, in what came to be known as the School Reform Act of 1989, 105 ILCS 5/34-1.01 et seq. When the Local School Councils established under the authority of that Act began exercising their power to dismiss principals, cases like the one before us began to appear in the courts. As we noted above, in the three earlier cases that district judges in the Northern District of Illinois had before them--Keenan, Asllani, and Schnettler--the court found each time that the 1980 Decree had, as a matter of law, superseded the 1977 Plan and that the principals in question therefore could not rely on the Protective Principles of the 1977 Plan as any kind of basis for relief. Judge Kocoras followed suit, but this time the Principals brought their claim to our court. This is therefore our first opportunity to consider the questions that are common to these claims.
 
 II
 
 19
 The Principals raise two issues for our review: first, whether the district court erred in determining as a matter of law that the Principals were not "intended beneficiaries" of the 1977 Plan, and second, whether the district court erred in concluding as a matter of law that the 1980 Consent Decree eliminated the 1977 Plan. We take these issues in reverse order, because if the lower court correctly decided that the 1977 Plan no longer has legal force, then it does not matter who was or was not an intended beneficiary under that Plan.[2]
 
 
 20
 The first, and potentially most important, question we must resolve deals with sources of information. To what evidence may we turn in order to decide whether the 1977 Plan, in whole or in part, survived the 1980 Consent Decree? The Principals argue that the scope of the 1980 Decree is sufficiently ambiguous that we should resort to extrinsic evidence in answering our central question. They note that the Decree does not contain an integration clause, even though it does say that "[b]oth parties agree that this Consent Decree is final and binding as to the issues resolved herein." But according to the Principals, this clause is not self-defining, for the dispositive question in their mind is what issues were "resolved herein" by the Consent Decree? They argue that only extrinsic evidence can show this, and have proffered voluminous materials, including affidavits from the Board members who voted to accept the 1980 Decree, numerous bulletins and other circulations from the Board itself that postdate the Decree, and other official materials--all of which refer to the 1977 Plan as if it were still alive and well. The Board, on the other hand, urges us to follow the three district judges who have already considered this point and to find that the 1980 Decree superseded the 1977 Plan for purposes of defining the Board's obligations under Title VI. The District argues that both it and the Department of Education--the actual parties to the Plan and the Decree--agree that the Decree supersedes the 1977 Plan; that the subjects covered in the 1977 Plan all appear (although in less detail) in the 1980 Decree; and that the Principals have failed to show the kind of objective, extrinsic evidence sufficient to prove a latent ambiguity and open the door to a fuller consideration of extrinsic evidence bearing on the agreement.
 
 
 21
 We begin, in keeping with well-established principles, with the plain language of the 1980 Decree. Although consent decrees have the force of a court order, they are also a form of contract to be construed according to basic principles of contract interpretation. See Goluba v. School Dist. of Ripon, 45 F.3d 1035, 1037-38 (7th Cir.1995). See also United States v. ITT Continental Baking Co., 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 1757-58, 29 L.Ed.2d 256 (1971) ("[T]he scope of a consent decree must be discerned within its four corners."). Thus, where a decree is "clear on its face, it is neither necessary nor appropriate to consider ... extrinsic evidence." Rumpke of Indiana, Inc. v. Cummins Engine Co., 107 F.3d 1235, 1243 (7th Cir.1997) (extrinsic evidence not considered because CERCLA consent decree was unambiguous). However, even "when the terms of the instrument are clear," extrinsic evidence may be used in the rare situation where a latent ambiguity exists, meaning the terms of the contract "cannot be applied because they do not fit the factual circumstances to which they are addressed." Ohio Cas. Group of Ins. Cos. v. Gray, 746 F.2d 381, 383-84 (7th Cir.1984). See also In re Herwig, 237 Ill.App.3d 737, 178 Ill.Dec. 641, 645, 604 N.E.2d 1164, 1168 (1992). Our task is to decide from the face of the Decree whether it was designed to supersede the 1977 Plan as a whole, for purposes of setting out the District's obligations under Title VI. If so, paragraph 7 of the introduction to the Decree makes the Decree "final and binding" on all such issues, and as the district courts found in Asllani, 845 F.Supp. at 1223, and Schnettler, 1994 WL 142958, at * 6-7, the 1980 Decree would be the "written modification" of the 1977 Plan for which the parties made provision. If, on the other hand, the 1980 Decree is ambiguous (either on its face or latently), so that one might reasonably construe it as superseding only parts of the 1977 Plan, we should turn to the extrinsic evidence the parties have offered and evaluate the district court's summary judgment decision in that light.
 
 
 22
 Although the complaint that led to the consent decree is literally extrinsic to the decree, we are entitled to look to the complaint to ascertain the scope of the lawsuit that the decree was intended to settle. ITT Continental Baking, 420 U.S. at 238, 95 S.Ct. at 935 (permissible to look at circumstances surrounding the formation of the consent order, including the complaint). Here, paragraph 1 of the Government's complaint specifically refers to not only various provisions of federal law as its basis, but also "the contractual assurances made by defendant Board of Education of the City of Chicago ... in consideration of its continuing receipt of federal financial assistance." One of the most important of those assurances was, beyond dispute, the 1977 Plan. The opening paragraph of the Consent Decree uses very broad language to describe its scope, which it says covers allegations that the Board "has engaged in acts of discrimination in the assignment of students and otherwise, in violation of federal law." (Emphasis added.) Student desegregation is only one of the topics covered by the decree, which indicates that the phrase "and otherwise" was not casual boilerplate, but rather was shorthand for all that follows. Both the complaint and the initial language of the Decree therefore leave little room for assuming that the 1977 Plan was intended to have any independent legal force after the Decree was signed.
 
 
 23
 Other evidence from the 1980 Decree also suggests that it was designed to be comprehensive. The range of subjects it covers is broad, encompassing student desegregation, additional programs and parties (i.e., interagency coordination, state responsibility, and the possibility of interdistrict remedies), classroom segregation, bilingual programs, and faculty assignment. Two of these subjects--bilingual programs and faculty assignment--were also expressly covered in the 1977 Plan in depth: 59 pages for bilingual education and 58 pages for faculty assignment. The 1981 plan later adopted by the Board as part of its implementation of the Decree follow through with a series of recommendations on these and other topics. See Student Desegregation Plan for the Chicago Public Schools: Recommendations on Educational Components, Chapter B.6. The 1980 Decree, in short, plainly supersedes the 1977 Plan on these two subjects, and we do not understand the Principals to be arguing otherwise.
 
 
 24
 But what of the third subject of the 1977 Plan, the assignment of principals? Is the absence of a specific named section in the 1980 Decree on this topic some evidence that the 1980 Decree was not intended to be comprehensive? We think not. Nothing says that the parties to the 1980 Decree were required to use the same topic outline for their agreement with respect to Title VI compliance that they had used three years earlier. The 1980 Decree was more in the nature of a blueprint for future elaboration, rather than a comprehensive action agenda like the 1977 Plan. In a blueprint, some items may receive only cursory attention. The principals received that kind of treatment. The 1980 Decree requires the Board to "make every good faith effort to follow professional staff assignment and transfer practices which, when taken together as a whole on a frequently reviewed periodic basis, will assure that the racial composition, the experience and the educational background of individual school faculties and administrative staff more nearly approach the citywide proportions of minority, experienced, and more extensively trained professional staff...." Section III.3.2 (emphasis added). The Board also forswears assignment and transfer practices "which will foreseeably result in the racial identifiability of schools based on faculty or administrative staff composition...." Id. (emphasis added).
 
 
 25
 All of this discussion is but a prelude for the main question, which is whether the 1977 Plan's Protective Principles somehow survived the 1980 Decree (either for all "certificated members of the teaching staff," the original persons covered by the principles, or for the subset that includes the principals). As before, we find no reason to presume that the Board and the Department of Education necessarily intended that every subject covered by the 1977 Plan should appear in the later document. Neither the 1980 Decree itself nor the complaint on which it was based gives even a hint of an intention to carve out the Protective Principles from the 1977 Plan and to preserve only that part of the earlier agreement between the parties. We note also that it would be incongruous to argue that the Principals may avail themselves of the 1977 Plan's Protective Principles while teachers, who retain a central role in the 1980 Decree, cannot. Yet that is precisely the interpretation we would have to accept were we to agree with the Principals, for even the Principals appear to concede that the 1980 Decree supersedes the 1977 Plan with respect to faculty matters.
 
 
 26
 Accordingly, we find that the 1977 Plan, as an agreement between the United States Department of Health, Education, and Welfare (and its successor, the Department of Education) and the Board of Education of the City of Chicago, was superseded entirely by the 1980 Consent Decree; the Protective Principles necessarily fell by the wayside along with the rest of the Plan. Although in light of this holding it is neither necessary nor even appropriate for us to base our reasoning on extrinsic evidence, we note in passing that the district judges who looked at the proffered extrinsic evidence all concluded that it was consistent with this result. See Keenan, 812 F.Supp at 784; Asllani, 845 F.Supp. at 1222, 1227-28; Schnettler, 1994 WL 142958, at * 6-7; Ahern, 1996 WL 134257, at * 4. The extrinsic evidence showed, as Judge Moran stated in Asllani, that the Board and the Department of Education intended to replace the 1977 Plan with the 1980 Decree, incorporating most of the Plan's substance but not necessarily all of it. See 845 F.Supp. at 1222-23 (quoting the Assistant Attorney General for Civil Rights as saying at oral argument that the consent decree "reflects the Board's final determination that the undertakings that were made several years ago ... deserved to be honored and they are reflected in this agreement"). The Principals respond by drawing our attention to a significant number of publications and written materials issued by the Board long after the 1980 Decree and the 1981 implementing plan were in place. We do not dispute that these materials exist, but in our view there is a dispositive difference between a contractual duty and a unilateral policy. There was nothing to prevent the Board, for its own purposes, to continue to refer to the 1977 Plan after the Plan's status as a binding contractual agreement with the Government had expired. The evidence proffered by the Principals, in which the Board mentioned the 1977 Plan in its hiring bulletins and policy statements, shows nothing more than this; none of it shows that the other party to the agreement thought the 1977 Plan had any force at all. To the contrary, in correspondence dated June 28, 1991, to then-Superintendent of Chicago Schools Ted Kimbrough, OCR advised that it was transferring a complaint similar to the plaintiffs' brought by a group of principals to the EEOC for resolution under Title VII. In that letter, OCR stated that:
 
 
 27
 The governing standards in this case are embodied in the 1977 Plan, the Consent Decree and the Desegregation Plan, if applicable. OCR has determined, however, that the 1977 Plan was superceded [sic] for Title VI purposes by the Consent Decree and the Desegregation Plan and that, for school segregation issues, the Consent Decree essentially prescribes the District's current Title VI obligations with respect to the assignment of principals.
 
 
 28
 Appellee Appendix at 376.
 
 
 29
 Because we have concluded that the 1977 Plan was supplanted by the Decree, we need not resolve the Principals' second argument, which is that the district court should have found that they were intended beneficiaries of the 1977 Plan. We note, however, that to the extent the Principals claim they may enforce the Plan as third-party beneficiaries, they appear to face an uphill climb under Illinois law, which follows a strict "intent to benefit rule." See Disposal Corp. v. John Sexton Contractors Co., 168 Ill.2d 355, 213 Ill.Dec. 665, 669, 659 N.E.2d 1312, 1316 (1995). See also Keenan v. Board of Educ., 812 F.Supp. at 784-85; Schnettler v. Board of Educ., 1994 WL 142958, at * 7 (both cases concluding that the Principals were incidental, not third-party, beneficiaries of the Plan). Under that test, it is not enough that a party receive merely an incidental benefit. See People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc., 78 Ill.2d 381, 36 Ill.Dec. 338, 340, 400 N.E.2d 918, 920 (1980). Instead, "third-party beneficiary status is a matter of divining whether the contracting parties intended to confer a benefit upon a nonparty to their agreement." Id. There is a strong presumption that parties intend contract provisions to apply only to themselves. 155 Harbor Drive Condominium Assoc. v. Harbor Point Inc., 209 Ill.App.3d 631, 154 Ill.Dec. 365, 375, 568 N.E.2d 365, 375 (1991). In fact, the presumption is so strong that in order to overcome it, there must "practically be an express declaration." Id. Because the Plan was "developed voluntarily by the Chicago School District in order to assure its compliance with Title VI," Appellee Appendix at 65, the primary beneficiaries of the Plan were necessarily the Chicago schoolchildren themselves, who are the participants in a federally funded program that Title VI protects. On the other hand, we must in fairness recognize that the Protective Principles, which impose due process-like obligations on the District, seem to speak in terms that suggest rights that run directly to the "certificated members of the teaching force." See, e.g., Appellee Appendix at 186 ("[N]o staff member may be dismissed or demoted ... unless he/she has been selected from among all other similarly certificated members of the teaching force on the basis of written, objective, and nondiscriminatory criteria.") (emphasis added). Nevertheless, we need not resolve the hypothetical question whether the Principals would have been entitled to enforce a still-extant 1977 Plan, because of our earlier conclusion that it was entirely superseded by the 1980 Decree.
 
 
 30
 For the foregoing reasons, we AFFIRM the judgment of the district court.
 
 
 
 [1]
 Along the way, Congress had split HEW into two separate Cabinet Departments: the Department of Education and the Department of Health and Human Services. See Pub.L. No. 96-88, 93 Stat. 668 (1979) (codified at 20 U.S.C. § 3401 et seq.)
 
 
 [2]
 One additional question remains outstanding, which is the Board's motion to strike the Principals' statement of facts. We deny that motion